**2022-1271**

In The

# United States Court of Appeals

### For The Federal Circuit

## MARK BESANCENEY,

*Petitioner*,

v.

## DEPARTMENT OF HOMELAND SECURITY,

*Respondent.*

### PETITION FOR REVIEW FROM
### THE MERIT SYSTEMS PROTECTION BOARD
### IN NO. PH-1221-19-0255-M-1

———————

### BRIEF OF PETITIONER

———————

John T. Harrington
R. Scott Oswald
THE EMPLOYMENT LAW GROUP, PC
1717 K Street NW, Suite 1110
Washington, DC  20006
(202) 261-2830
tharrington@employmentlawgroup.com
soswald@employmentlawgroup.com

*Counsel for Petitioner*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 22-1271 |
| **Short Case Caption** | Besanceney v. DHS |
| **Filing Party/Entity** | Mark Besanceney (petitioner) |

---

**Instructions:** Complete each section of the form.  In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.  **Please enter only one item per box; attach additional pages as needed and check the relevant box**.  Counsel must immediately file an amended Certificate of Interest if information changes.  Fed. Cir. R. 47.4(b).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 12/20/2021                Signature:    /s/ John T. Harrington

                                Name:        John T. Harrington

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.  ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☑ None/Not Applicable |
| Mark Besanceney | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☑    None/Not Applicable              ☐    Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.**  Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal.  Do not include the originating case number(s) for this case.  Fed. Cir. R. 47.4(a)(5).  See also Fed. Cir. R. 47.5(b).

☑    None/Not Applicable              ☐    Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable              ☐    Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF RELATED CASES ............................................... viii

STATEMENT OF JURISDICTION.................................................... 1

STATEMENT OF THE ISSUES......................................................... 2

STATEMENT OF THE CASE............................................................ 4

    I.      Besanceney is a seasoned investigator with 39 years of experience in law enforcement............................................. 5

    II.     Besanceney led the investigation of baggage theft at LaGuardia airport and refused his supervisors' repeated attempts to pressure him to obtain search warrants when Besanceney reasonably believed that no probable cause for the search warrants existed...................................................................... 6

    III.    Besanceney made protected disclosures to Vasey and Williams on three separate occasions regarding violations connected to the lack of probable cause to secure a search warrant ........................ 11

    IV.    Besanceney escalated his disclosures up the chain of command after experiencing retaliation............................................. 12

    V.     Besanceney experienced additional retaliation with the issuance of his proposed removal; he engaged in additional protected activity in his response to the proposed removal and disclosed Vasey's abuse of authority ............................................... 15

          a.     Besanceney reasonably believed Vasey assaulted his ex-wife, stalked his ex-girlfriend, and illegally audio recorded a meeting with Besanceney........................................ 16

b.  Besanceney reasonably believed Vasey or Williams recorded their July 2017 meeting without his knowledge or consent .................................................................................17

VI.  The adverse actions taken by the TSA have caused Besanceney to experience emotional distress and have damaged his professional reputation, his prospects for promotion at TSA, and his prospects for employment outside of TSA ............................18

SUMMARY OF THE ARGUMENT .....................................................19

ARGUMENT .......................................................................................22

Standard of Review..........................................................................22

A.  Violations of law, rule, or regulation need not be specifically identified..................................................24

B.  Gross mismanagement is a management action or inaction that may significantly impact an agency's ability to accomplish its mission; and abuse of authority is a fact-driven inquiry.....................................................25

C.  Three factors are considered in determining whether a disclosure involves a substantial and specific danger to public health or safety.............................................26

D.  The Board erred in finding Besanceney did not make any protected disclosures under the WPA......................27

E.  The Board erred when it determined that Besanceney's reports of the mishandled LGA theft investigation are not protected disclosures under the WPEA ....................27

F.  The Board erred when it determined Besanceney's reports of Vasey's abuse of authority are not protected disclosures under the WPEA ....................................37

G.     The Board further erred in not considering the prohibited personnel practices taken against Besanceney by TSA or the causal link between those actions and his protected disclosures ................................................................41

H.     The Board erred in not considering or analyzing whether TSA met its heavy burden to show by clear and convincing evidence that it would have taken the same personnel actions in the absence of Besanceney's disclosures ................................................................44

CONCLUSION .......................................................................46

ADDENDUM

CERTIFICATE OF FILING AND SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF CONTENTS

**Page(s)**

## CASES

*Agoranos v. Dep't of Justice*,
    602 Fed. Appx. 795 (Fed. Cir. 2015) .............................................45

*Benton-Flores v. Dep't of Def.*,
No. DC-1221-13-0522-W-1,
    2014 WL 3748419 (M.S.P.B. July 31, 2014)................................42

*Carr v. Soc. Sec. Admin.*,
    185 F.3d 1318 (Fed. Cir. 1999) .............................................41, 44

*Chambers v. Dep't of the Interior*,
    602 F.3d 1370 (Fed. Cir. 2010) ............................................ 26-27

*Chavez v. Dep't of Veterans Affairs*,
    120 M.S.P.R. 285 (2013)................................................................25

*Consol. Edison Co. of N.Y. v. NLRB*,
    305 U.S. 197 (1938)......................................................................45

*Day v. Department of Homeland Security*,
    119 M.S.P.R. 589 (2013)...............................................................28

*Drake v. Agency for Int'l Dev.*,
    543 F.3d 1377 (Fed. Cir. 2008) ....................................................25

*Fisher v. Env't Prot. Agency*,
    108 M.S.P.R. 296 (2008)..........................................................23, 25

*Frederick v. Dep't of Justice*,
    73 F.3d 349 (Fed. Cir. 1996) ........................................................23

*Illinois v. Gates*,
    462 U.S. 213 (1983).................................................................30, 34

iv

*Jacobs v. Dep't of Justice*,
   35 F.3d 1543 (Fed. Cir. 1994) ....................................................45

*Johnson v. Dep't of Justice*,
   104 M.S.P.R. 624 (2007) ............................................................34

*Johnson v. Dep't of Justice*,
No. DC-1221-06-0388-W-1,
   2007 WL 447155 (M.S.P.B. Feb. 6, 2007)...................................38

*Kewley v. Dep't of Health & Human Serv.*,
   153 F.3d 1357 (Fed. Cir. 1998) ..................................................22

*LaChance v. White*,
   174 F.3d 1378 (Fed. Cir. 1999) .....................................22, 24, 25

*Langer v. Dep't of Treasury*,
   265 F.3d 1259 (Fed. Cir. 2001) ..................................................25

*Marano v. Dep't of Justice*,
   2 F.3d 1137 (Fed. Cir. 1993) ......................................................41

*Maryland v. Pringle*,
   540 U.S. 366 (2003)...................................................................29

*Miller v. Dep't of Justice*,
   842 F.3d 1252 (Fed. Cir. 2016) ..................................................44

*Riley v. California*,
   573 U.S. 373 (2014)...................................................................35

*Rubendall v. Dep't of Health & Human Servs.*,
   101 M.S.P.R. 599 (2006)............................................................42

*Rusin v. Dep't of the Treasury*,
   92 M.S.P.R. 298 (2002)..............................................................25

*Salinas v. Dep't of the Army*,
   94 M.S.P.R. 54 (2003)................................................................25

*Schneider v. Dep't of Homeland Sec.*,
    98 M.S.P.R. 377 (2005) ............................................................24, 33

*S.H. v. D.C.*,
    270 F. Supp. 3d 260 (D.D.C. 2017) .............................................31

*Shriver v. Dep't of Veterans Affairs*,
    89 M.S.P.R. 239 (2001) ......................................................... 25-26

*Sinko v. Dep't of Agr.*,
    102 M.S.P.R. 116 (2006) ...........................................................25

*United States v. Calandra*,
    414 U.S. 338 (1974) ...................................................................34

*United States v. Harris*,
    403 U.S. 573 (1971) ...............................................................31, 38

*United States v. Leon*,
    468 U.S. 897 (1984) ...............................................................31, 34

*Webb v. Dep't of Interior*,
No. DA-1221-14-0006-W-1,
    2015 WL 150466 (M.S.P.B. Jan. 13, 2015) ................................28

*Wheeler v. Dep't of Veterans Affairs*,
    88 M.S.P.R. 236 (2001) ..............................................................26

*White v. Dep't of Air Force*,
No. DE-1221-92-0491-M-4, 2003 WL 22175176 (M.S.P.B. Sept. 11, 2003), *aff'd*,
    391 F.3d 1377 (Fed. Cir. 2004) ...................................................40

*Whitmore v. Dep't of Labor*,
    680 F.3d 1353 (Fed. Cir. 2012) .............................................41, 45

## CONSTITUTIONAL PROVISION

U.S. Const. amend. IV ....................................................................*passim*

## STATUTES

5 U.S.C. § 2302(a) ...................................................................................23

5 U.S.C. § 2302(a)(2)(D) .........................................................................23

5 U.S.C. § 2302(b)(8)..................................................................................1

5 U.S.C. § 2302(b)(9)..................................................................................1

5 U.S.C. § 7703 ...........................................................................................2

5 U.S.C. § 7703(c) .....................................................................................22

18 U.S.C. § 1621 .......................................................................................31

## REGULATION

5 C.F.R. § 1201.4(q) .................................................................................23

## OTHER AUTHORITIES

135 Cong. Rec. 5033 (1989) (Explanatory Statement on S. 20) ............................42

TRANSPORTATION SECURITY AGENCY, https://www.tsa.gov/about/tsa-mission (last visited Oct. 31, 2018) .........................................................34

## STATEMENT OF RELATED CASES

There is no other appeal or proceeding in any other court related to this same civil action. There are no known cases pending in this or any other court that will directly affect or be directly affected by this Court's decision in this pending petition.

## STATEMENT OF JURISDICTION

On May 8, 2019, Petitioner Mark Besanceney filed an individual right of action (IRA) appeal and hearing request with the Merit Systems Protection Board submitting his claim of reprisal for whistleblowing, pursuant to 5 U.S.C. § 2302(b)(8) and 5 U.S.C. § 2302(b)(9).  Besanceney pled that the United States Department of Homeland Security (DHS), Transportation Security Administration (TSA) - Investigations (INV), formerly known as Office of Inspection, violated 5 U.S.C. § 2302(b)(8) and 5 U.S.C. § 2302(b)(9), when it retaliated against him for making protected disclosures.

MSPB Administrative Judge (AJ) Kara Svendsen issued an Initial Decision on April 9, 2020. Judge Svendsen granted TSA's motion to dismiss and dismissed Besanceney's appeal for lack of jurisdiction without the requested hearing. The AJ found that Besanceney failed to establish that he made a protected disclosure under the WPA. Besanceney timely filed a Petition for Review with this Court on May 29, 2020.

On December 8, 2020, Respondent The Merit Systems Protection Board moved, with Besanceney's consent, to remand this case for a new determination of whether Besanceney made a nonfrivolous allegation of a protected disclosure. On January 22, 2021, this Court granted the MSPB's motion and remanded the case for further adjudication.

1

Administrative Judge Svendsen conducted a hearing on April 27 and 28, 2021.  On September 27, 2021, Judge Svendsen issued an Initial Decision in which she denied Besanceney's request for corrective action.  Judge Svendsen found that none of the disclosures he raised before the Office of Special Counsel (OSC) are protected under the Whistleblower Protection Act (WPA) because none actually disclosed any alleged wrongdoing by TSA or its employees. Appx28. The Initial Decision issued by Judge Svendsen became final on November 1, 2021. Appx29.

Besanceney timely filed a Petition for Review with this Court on December 16, 2021.  The appeal is from the Initial Decision issued by Judge Svendsen on September 27, 2021, that became final on November 1, 2021, which disposed of Besanceney's claims before the MSPB.  Accordingly, this Court has jurisdiction to review this matter pursuant to 5 U.S.C. § 7703.

## STATEMENT OF THE ISSUES

1.      Whether the Board erred in finding that Besanceney's December 2016 disclosure to his supervisors about the lack of probable cause for a search warrant was not protected, when that disclosure involved a violation of law, notably the Constitution, gross mismanagement, and a danger to public health or safety; and whether the Board particularly erred in not analyzing Besanceney's reasonableness in his belief of the same.

2.     Whether the Board erred in finding that Besanceney's disclosure on April 12, 2017, was not protected, when he met with his supervisors and raised concerns about an investigation, which described violations of law and gross mismanagement.

3.     Whether the Board erred in finding that Besanceney's disclosure on September 11, 2017, was not protected, when he emailed a complaint to Investigations Division Deputy Director Bobo and Acting Assistant Administrator John Busch describing the mishandling of an investigation.

4.     Whether the Board erred in finding that Besanceney's disclosure on September 12, 2017, was not protected, when he forwarded his September 11, 2017, complaint to Investigations Division Business Management Office Director Susie Williams, again raising concerns of the mishandling of an investigation.

5.     Whether the Board erred in finding that Besanceney's disclosure on November 16, 2017, was not protected, when he disclosed Williams's and Vasey's mishandling of an investigation in his response to the Notice of Proposed Removal.

6.     Whether the Board erred in finding that Besanceney's disclosure on February 6, 2018, was not protected, when he alleged an assault, abuse, and potentially an illegal audio recording by his supervisor, Vasey, constituting a report of an abuse of authority.

7.    Whether the Board erred in finding that Besanceney's disclosure on February 12, 2018, was not protected, when he disclosed DSAIC Vasey's alleged misconduct to INV's Special Investigations Unit (SIU).

8.    Whether the Board erred in finding that Besanceney's disclosure on March 7, 2018, was not protected, when he disclosed DSAIC Vasey's alleged misconduct to the DHS Office of the Inspector General (OIG).

9.    Whether the Board erred in not considering the prohibited personnel practices taken against Besanceney by TSA or the causal link between those actions and his protected disclosures.

10.    Whether the Board erred in not considering or analyzing whether TSA met its heavy burden to show by clear and convincing evidence that it would have taken the same personnel actions in the absence of Besanceney's disclosures.

## STATEMENT OF THE CASE

Besanceney worked for the U.S. Secret Service for 20 years prior to being employed by the TSA. Appx948-949. In 2003, Besanceney accepted the position of Deputy Special Agent in Charge (DSAIC) for the Detroit field office of the TSA. Appx950-951. Besanceney voluntarily stepped aside from his supervisory role in Detroit to be an investigator in Cincinnati. Appx951-952. Besanceney has been a Criminal Investigator for the TSA since 2008. Appx953. In 2015, Besanceney opted to transfer to the New York office to be closer to his wife, even

with the understanding that many individuals did not like the placement. Appx956-957.

In New York, Besanceney's first-line supervisor was Deputy Special Agent in Charge, Jeffrey Vasey, and his second-line supervisor was the Special Agent in Charge, Thomas Williams. Appx957. Besanceney transferred from New York to a satellite office in Boston in September 2016. Appx959. Besanceney continued to report to Vasey until Vasey retired in 2018. Appx958.

From 2016 to 2018, Besanceney made eight protected disclosures regarding Vasey and Williams that began with an investigation Besanceney led into baggage theft at the LaGuardia airport. Appx7.

## I.     Besanceney is a seasoned investigator with 39 years of experience in law enforcement.

Besanceney holds a Bachelor's degree in marketing and a master's degree in criminal justice. Appx947-948. He has received specialized training from criminal investigator school and Secret Service school. Appx948. Besanceney began his Secret Service career in the Miami office, and participated in the criminal squad, counterfeit squad, and fraud squad. Appx949. While working for the Secret Service, Besanceney gained valuable experience obtaining criminal warrants. Appx949. He also had specific experience conducting consent searches in cases where there was not probable cause but merely reasonable suspicion. Appx950.

Besanceney served in a supervisory role with the Secret Service in the field, at headquarters, and on a protection assignment. Appx950. His last three to four assignments with the Secret Service were supervisory. Appx950.

As DSAIC for the TSA, Besanceney's primary role was to back up the Special Agent in Charge (SAIC). Appx951. This included reviewing applications, interviewing applicants, securing equipment, telephones, swearing people in, and assigning cases to one of six to eight investigators. Appx951. The responsibilities of a Criminal Investigator include being assigned to a case and creating an attack plan, which includes criminal and administrative tracks. Appx953-954. Investigators manage multiple cases at once. Appx953-954. Besanceney is at the top of the K band pay scale and has never been demoted. Appx1110.

**II.    Besanceney led the investigation of baggage theft at LaGuardia airport and refused his supervisors' repeated attempts to pressure him to obtain search warrants when Besanceney reasonably believed that no probable cause for the search warrants existed.**

Besanceney became aware of the LaGuardia baggage theft through an email from a JetBlue security liaison, Sean Joyce. Appx964, Appx971-972. Joyce reported that JetBlue had been experiencing thefts of passenger baggage. Appx1130-1131. Besanceney corresponded with Joyce throughout August 2016. Appx964-965. Joyce provided Besanceney with images of bags and items that were stolen. Appx964-965. Cameras were installed in the baggage screening room at LaGuardia in October 2016 for about thirty days to record the actions of the

baggage screeners, or to identify any other actors involved. Appx965, Appx1130-1131, Appx478.

On November 21, 2016, Besanceney emailed Vasey, Williams, and Karen Mogavero, an investigator counterpart at John F. Kennedy airport, informing them of the LaGuardia investigation. Appx964-965. The investigation included viewing videos of the screening room, identifying the 15 to 20 screeners, and seeing who was being honest. Appx966. Besanceney identified two suspects in a November 21, 2016, email to Vasey, Williams, and Mogavero. Appx966. When suspects are identified in a case, the investigator immediately notifies management; however, this limits the investigator's ability to do his job efficiently. Appx966-967.

Besanceney met with two managers at LaGuardia, the Federal Security Director for screening and the Assistant Federal Security Director, the day before Thanksgiving and showed them snippets of video surveillance of two suspects pilfering through luggage. Appx967. The two TSA employees identified as suspects were suspended shortly after it was discovered they were committing theft. Appx1131-1132. Once the suspects were suspended, they could no longer be surveilled in the baggage room. Appx1132.

The surveillance cameras operated for roughly another week after the suspects were suspended. Appx969. The TSA did not have the resources to review the surveillance footage in real time. Appx969-970. There was no surveillance of

the stolen items after the items left the LaGuardia baggage room. Appx976. The investigation into the baggage thefts was officially opened on December 2, 2016, and was assigned to Besanceney. Appx485, Appx1132.

On November 21 and 23, 2016, Joyce emailed Besanceney with the time and date of complaints and the items stolen. Appx971-972. Besanceney forwarded these emails to Gloria Markousis, an administrative assistant at LaGuardia, to help put the items in the record. Appx972-973. Vasey's response to the forwarded emails indicated that he wanted to get a search warrant; however, Besanceney knew that was not possible and it caused him to question Vasey's understanding of proper investigative protocol. Appx973.

Besanceney did not obtain the search warrants, as there was no way to ascertain where the stolen property went after it left the baggage room, a requirement to establish probable cause.  Appx974. Vasey stated that review of the footage would not have tied stolen items to the suspects' residences and it would have needed someone to place the objects in the suspects' homes. Appx1211.

Besanceney understood that probable cause requires the affiant to present an affidavit for a search warrant with meticulous description of the items to be seized, how they were traced, and where they can be found. Appx975. But Besanceney and others involved in the investigation did not know where the stolen property went after the property left the baggage room. For that reason, Besanceney had

been communicating to Vasey and Williams about conducting consent searches. Appx970.

Besanceney spoke with Judy Phillips, Assistant US Attorney (AUSA) for the Eastern District of New York, to inform her that there was an ongoing investigation that did not rise to the level of a search warrant and that Vasey and Williams wrongly wanted one. Appx976-977. Besanceney contacted Phillips prior to December 5, 2016. Appx977. Phillips appreciated Besanceney's briefing and referred him to the Queens District Attorney's (DA) Office. Appx977-978.

Typically, the case agent would determine whether it was possible to obtain a search warrant. Appx1134. But Besanceney's supervisors consistently asserted their misguided opinions regarding probable cause. Even so, Besanceney repeatedly told Vasey and Williams that he planned to conduct consent searches. Appx1111.

Williams responded to Besanceney's December 3, 2016, operation plan by stating that they may need support when they go to New York for the consent searches *or the search warrants*. Appx983-984. Besanceney's email on December 4, 2016, contained the subject line "Operations Plan Consent Searches" and reviewed the plan and its objectives, focused only on consent searchers. Appx205, Appx1140-1141.

Besanceney believed he had a greater than 50% chance of retrieving information or stolen goods from the suspects, especially because of the video snippets. Appx986-987. Despite Vasey and Williams's awareness of Besanceney's plan, no searches were conducted on December 5, 2016, as Vasey and Williams abruptly shut down the operation that morning. Appx990. Vasey indicated to Williams that "the work [they] had expected to be done" was not completed, and there was no "work product to go to a district attorney's office" if the officers received pushback from the suspects. Appx1141-1142. Williams testified that he "could have made an articulation that there was probable cause" for search warrants in the baggage theft investigation but stopped short of asserting that there was probable cause. Appx1191.

John Busch, the Director of the Investigations Division and Besanceney's fourth-line supervisor at the time, said that if probable cause did not yet exist, then a search warrant should not be obtained; however, during the investigation planning conversation, other metrics need to be considered with regard to how to establish probable cause to get the warrant. Appx1298-1299.

Besanceney continued to work on the case, even after transferring to the Boston office, until the case was transferred to another investigator in May 2017. Appx994-995, Appx997. Until May 2017, Besanceney continued to review video

footage and visit pawn shops to locate property stolen from the baggage room.

Appx1144.

### III.  Besanceney made protected disclosures to Vasey and Williams on three separate occasions regarding violations connected to the lack of probable cause to secure a search warrant.

Besanceney's first protected disclosure occurred when Williams and Vasey took Besanceney aside on the morning of December 5, 2016, to tell him they were shutting down the operation because they believed there should be a search warrant. Besanceney knew that if they did not conduct consent searches, the investigation would be compromised. Appx990-991. Williams and Besanceney disagreed regarding the extent of permissible searches and whether *Garrity* applied to this scenario. Appx991-992. Besanceney told Williams and Vasey during this meeting that he did not believe probable cause existed for a search warrant. Appx992.

Besanceney's second disclosure regarding the violations related to the LaGuardia investigation occurred on April 12, 2017, during his quarterly performance review with Williams and Vasey. Appx7. Besanceney asked Williams and Vasey about the basis for their decision to shut down the December 5, 2016, operation as well as some additional investigation questions. Appx1011-1012. Besanceney's third disclosure of the same kind occurred on July 25, 2017, during his mid-year performance review with Williams and Vasey. Appx7.

### IV.    Besanceney escalated his disclosures up the chain of command after experiencing retaliation.

After Besanceney's protected disclosures on December 5, 2016, and April 12, 2017, Vasey and Williams began to consistently reject the Memorandums of Investigation (MOIs or investigative memos) Besanceney wrote on the case. Appx997. Their only purported reasons for rejecting the memos written by Besanceney were mere grammatical and formatting errors. Appx998.

Besanceney's memos had never been rejected for grammatical or formatting errors prior to the April 12, 2017, meeting. Appx999. There were no case management issues documented in Besanceney's 2016 review. Appx1004. Vasey rated Besanceney as achieving or exceeding expectations in the three performance goals in his 2015 evaluation, but found he was somehow unacceptable in the competencies. Appx461, Appx1127. Williams testified that it "was unusual" for someone to be found unacceptable in one or more competencies and yet meet all of their performance goals; he said, "I haven't had any other situation like this." Appx461, Appx1127.

Besanceney's 2016 performance review indicated he was closing cases and submitting reports in a timely manner. Appx464, Appx1128-1129. Besanceney's performance in 2016 was rated as exceeding expectations in two of three performance goals and rated as achieving expectations on the third. Additionally, he exceeded expectations in four of the six competencies and achieved

12

expectations on the other two, demonstrating his ability to handle multiple cases and adhere to time constraints. He was awarded for this positive performance review. Appx464, Appx1129-1130.

Williams issued a memo of counseling to Besanceney on June 4, 2017, authored by Vasey and reviewed and edited by Williams. Appx499, Appx1147. Williams consulted with Vasey regarding the issuance of this memo of counseling, and the memo was based on information provided to him by Vasey. Appx499, Appx1148. Williams relied on Vasey's opinion regarding the edits purportedly required on Besanceney's MOIs when issuing Besanceney's counseling memo. Appx1148-1149.

After issuing Besanceney a counseling memo on June 4, 2017, Williams placed him on an Improvement Period Notice (IPN). Appx1151. Williams and Vasey presented Besanceney with the IPN on July 25, 2017, after Williams checked with Darci Bobo, Deputy Director of the Investigations Division and Besanceney's third-line supervisor, and Busch. Appx1151-1152. Williams did not recall whether he took notes during the July 25, 2017, meeting but stated that the memo of the meeting he later produced was an amalgamation of both his and Vasey's after-meeting notes. Appx190, Appx1152-1154. Vasey said that during his tenure as DSAIC, only Besanceney was issued an IPN. Appx1202. The discussion of the IPN included the LaGuardia theft case. Appx1006.

In Besanceney's counseling memo, Williams and Vasey directed Besanceney to complete additional MOIs and allotted him a week to do so. Appx1171-1174. Besanceney requested additional time (five weeks), though he assured Williams it likely would not take that long. Williams testified that this was a reasonable request. Appx1171-1174. In Besanceney's experience, no one had ever previously imposed a timeline on when MOIs need to be completed. Appx955. Prior to 2016, no one had ever told Besanceney that his MOIs were untimely. Appx956. Prior to 2016, none of Besanceney's MOIs were ever rejected (though some would consult with Besanceney about the contents of a report). Appx956.

Vasey and Williams's requirement that Besanceney submit all memos within three to five days after any investigatory activity was a rule of which Besanceney had never heard (and, to his knowledge, no one else had ever heard of). Appx999. Prior to April 2017, Besanceney never had any discussions with Vasey or Williams about turning in MOIs within three to five days. Appx999. The next step after issuing the memo was a formal notification to try and improve an employee's performance. Appx1176.

Besanceney expressed in emails to Vasey and Williams his belief that they were deliberately digging him into a hole at work. Appx1004-1005. Besanceney believed that the hole that Vasey and Williams had dug for him was putting him

behind in his work—by an estimated 12 to 15 weeks. Appx1005. This was all

caused by Vasey and Williams's consistent rejections of Besanceney's work for

pretextual reasons. Appx1005.

Williams testified that Besanceney's performance did not improve following

his June 4, 2017, memo of counseling. Appx1188. However, Williams placed him

on an improvement plan only six weeks after that memo and then proposed his

removal almost immediately after the 60-day IPN period. Appx1188.

On September 11, 2017, Besanceney made is fourth protected disclosure

when he submitted a formal complaint of retaliation to Bobo. Appx1009. Neither

Bobo nor anyone else contacted Besanceney about his complaint. Appx1013.

**V.    Besanceney experienced additional retaliation with the issuance of his proposed removal; he engaged in additional protected activity in his response to the proposed removal and disclosed Vasey's abuse of authority.**

Williams testified he was aware of Besanceney's complaint to Bobo

reporting retaliation and mismanagement but did not recall exactly when he was

made aware. Appx1155. Williams proposed Besanceney's removal following his

report of retaliation and mismanagement; and Williams discussed Besanceney's

complaint of retaliation and mismanagement against him with the deciding

official—Bobo. Appx1155-1156. Williams based Besanceney's notice of proposed

removal on Besanceney's alleged failure to meet the requirements of the IPN.

Appx96, Appx1157. Besanceney was the only employee Williams ever put on an improvement plan or recommended for removal. Appx1157.

According to Bobo, Besanceney's proposed removal was based on Williams's claim that Besanceney did not meet the requirements of his IPN. Appx1268. Bobo reviewed Besanceney's response to the proposed removal and it essentially discussed the same matters discussed in Besanceney's complaint. Appx1268. Bobo said that, to some degree, there may have been discussion in Besanceney's response to the proposed removal about him being set up for failure following the disputes with his superiors involving the LaGuardia investigation. Appx1268.

Bobo concluded that while there were deficiencies in Besanceney's performance, they did not warrant removal—and for that reason, she did not address Besanceney's complaint of retaliation in her January 25, 2018, decision on removal. Appx1269.

> **a.      Besanceney reasonably believed Vasey assaulted his ex-wife, stalked his ex-girlfriend, and illegally audio recorded a meeting with Besanceney.**

Besanceney received information from two reliable sources that Vasey had assaulted his ex-wife. Appx1098. Besanceney received an unsigned affidavit in the mail that was very detailed and deeply troubling. Appx1100. Besanceney received an unsigned copy of Vasey's divorce proceeding, articulating allegations of

assault. Appx1097-1098. It is Besanceney's duty to report off-duty misconduct, particularly misconduct committed by managers. Appx1103.

Besanceney's sixth protected disclosure occurred during a February 6, 2018, meeting with Vasey and Williams, in which Besanceney asked Vasey whether he had hit his wife. Appx1093. Besanceney felt it was his duty as a TSA investigator to report Vasey's alleged behavior. Appx1095. Williams reported the allegations made by Besanceney against Vasey. Appx1185.

Besanceney's seventh disclosure occurred on February 12, 2018, when he reported Vasey's abuse of authority to TSA's Special Investigations Unit (SIU). Appx7. The SIU opened an investigation into Vasey but did not interview his ex-wife about the allegations of assault. Appx1099. Williams was interviewed by the investigators looking into Besanceney's allegations against Vasey. Appx1185. Besanceney's eighth and final disclosure was on March 7, 2018, when he disclosed Vasey's abuse of authority to TSA's Office of Inspector General (OIG). Appx7.

### b.    Besanceney reasonably believed Vasey or Williams recorded their July 2017 meeting without his knowledge or consent.

Besanceney reasonably believed Vasey and Williams had recorded their July 2017 meeting when he realized the memo he received following the meeting was much too detailed to have been based on recollection or notes made after the meeting. Appx1104. Besanceney reported his reasonable belief of an illegal audio

recording to Bobo—after first discussing it with Vasey and Williams. Appx1105-1106.

Besanceney made a detailed statement to the Special Investigations Unit, detailing his reasonable belief that a secret audio recording had been made, but investigators nonetheless failed to find evidence of the recording. Appx1106. Despite the seriousness of an allegation of secretly recording an employee, Vasey and Williams were not disciplined or terminated. Appx1107.

Williams said he only "sometimes" takes notes during meetings or performance reviews. Appx502, Appx1145. Vasey is unaware of any email in which he shared any handwritten notes related to this meeting with Williams. Appx1250. Vasey did not recall taking notes at the meeting. Appx1216-1217. It is against state law and TSA policy for Vasey and Williams to have recorded their conversation with Besanceney without his consent. Appx1009.

### VI. The adverse actions taken by the TSA have caused Besanceney to experience emotional distress and have damaged his professional reputation, his prospects for promotion at TSA, and his prospects for employment outside of TSA.

TSA's adverse actions have been "extremely stressful" for Besanceney; he has been "humiliated, demoralized, and harassed." Appx1321-1322. He has lost weight and (pre-COVID) stopped socializing with friends due to the stress caused by TSA; and that stress has adversely affected his marriage. Appx1321-1322.

Despite his "stellar reputation" prior to his protected disclosures, his opportunities for promotion within TSA "have been crushed" and his employment prospects, if he leaves TSA, have been harmed. Appx1322-1323.

## SUMMARY OF THE ARGUMENT

The Board erred in finding that five disclosures made by Besanceney in relation to the LGA baggage theft investigation were not protected disclosures under the WPEA. Besanceney had a good faith belief that Williams and Vasey were violating rules, regulations, and the law when they pressured him to obtain federal search warrants, based on probable cause, when no probable cause existed.

Besanceney reported his protected concerns five times: 1) during a December 5, 2016, discussion with Williams and Vasey regarding the lack of probable cause; 2) during Besanceney's April 2, 2017, quarterly review when he again reported Williams and Vasey's mishandling of the LGA theft investigation (including the attempts to pressure him to obtain search warrants); 3) during Besanceney's July 25, 2017, mid-year review when he again disclosed Williams and Vasey's mishandling of the LGA theft investigation (including the attempts to pressure him to obtain search warrants); 4) in his September 11, 2017, email to Bobo; and 5) in his November 16, 2017, response to the Notice of Proposed Removal.

Besanceney, as the objectively reasonable officer placed in charge of the investigation, did not believe the available evidence created probable cause sufficient to obtain a search warrant. Rather, he believed the evidence never rose above the standard of reasonable suspicion because there was no evidence as to where the stolen items were taken after they were stolen. Moreover, requiring Besanceney to sign an affidavit falsely attesting to his "belief" of probable cause could subject him to both civil and criminal penalties. Besanceney had a reasonable belief that 1) signing a dishonest affidavit to obtain a search warrant was illegal and improper; and 2) even if he were to obtain such a search warrant without an affidavit, executing it could result in constitutional infringements and suppressed evidence. While determining whether there is sufficient probable cause for a search warrant in a particular instance may be "debatable," it involves a legal standard created by the Constitution of the United States and further defined by the Supreme Court. A dispute regarding the appropriate level of evidence necessary to establish probable cause is not a disagreement about a policy or a strategic decision.

Besanceney also reasonably believed Vasey had engaged in off-duty misconduct (constituting an abuse of authority) that Besanceney was required to report—and which he did report. Besanceney received information from two reliable sources regarding this alleged off-duty misconduct. And Besanceney

reasonably believed Vasey or Williams recorded a July 2017 meeting without his knowledge or consent; the memo he received following the meeting was much too detailed to have been based on recollection or notes made after the meeting. Besanceney reported his reasonable belief of an illegal audio recording to Bobo—after first discussing it with Vasey and Williams.

Besanceney's sixth protected disclosure occurred during a February 6, 2018, meeting with Vasey and Williams, when he reported the misconduct allegations and the illegal recording; and his seventh disclosure occurred on February 12, 2018, when he reported Vasey's abuse of authority to TSA's Special Investigations Unit (SIU). Besanceney's eighth and final disclosure was on March 7, 2018, when he disclosed Vasey's abuse of authority to TSA's Office of Inspector General (OIG).

The Board did not address Besanceney's reasonable belief or even why he believed he was being recorded; there is nothing in the Board's decision to indicate the Board considered or even acknowledged the unusually detailed July 2017 memo, nor considered whether a disinterested observer would find this a report of wrongdoing. As the Board failed to address certain facts altogether, as well as failed to apply the appropriate test to Besanceney's beliefs, it erred in finding that this disclosure was unprotected.

The Board further erred in not considering the prohibited personnel practices taken against Besanceney by TSA or the causal link between those actions and his protected disclosures. Besanceney's protected activities contributed to the adverse personnel actions that escalated over the course of his employment with TSA. The time between each of Besanceney's protected activities and the corresponding personnel action is substantially less than six months, which is "sufficiently proximate" to satisfy the timing prong of the knowledge-timing test. Though unacknowledged by the Board, Besanceney established that his protected activities were a contributing factor in the personnel actions taken against him.

Finally, the Board erred in not considering or analyzing whether TSA met its heavy burden to show by clear and convincing evidence that it would have taken the same personnel actions in the absence of Besanceney's disclosures.

## ARGUMENT

### Standard of Review

This Court must set aside the MSPB's decision if it finds that it was: (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence. *See* 5 U.S.C. § 7703(c); *Kewley v. Dep't of Health & Human Serv.*, 153 F.3d 1357, 1361 (Fed. Cir. 1998). Questions of law are reviewed *de novo. See LaChance v. White*, 174

F.3d 1378, 1380 (Fed. Cir. 1999) (citing *Frederick v. Dep't of Justice*, 73 F.3d 349, 351-52 (Fed. Cir. 1996)).

To prevail under a claim of violation of the Whistleblower Protection Act (WPA), as amended by the Whistleblower Protection Enhancement Act (WPEA), an employee must prove by a preponderance of the evidence that: (1) he engaged in whistleblowing activity by making a protected disclosure, or engaged in other protected activity; and (2) the disclosure activity was a contributing factor in the agency's decision to take or fail to take one of the personnel actions listed at 5 U.S.C. § 2302(a). Preponderant evidence is that degree of relevant evidence a reasonable person, considering the record as a whole, would accept as sufficient to find a contested fact is more likely to be true than untrue. 5 C.F.R. § 1201.4(q).

Under the WPA, a protected disclosure is a "formal or informal communication or transmission" that an employee reasonably believes evidences "(i) any violation of any law, rule, or regulation; or (ii) gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety." 5 U.S.C. § 2302(a)(2)(D). An employee may establish his reasonable belief by showing that the disclosure he made concerned a matter which a reasonable person in his position would have believed constituted a protected disclosure under the WPA. *See Fisher v. Env't Prot. Agency*, 108 M.S.P.R. 296, ¶ 7 (2008). The test of whether an appellant possessed a reasonable belief that he

made protected disclosures under the WPA is "whether a disinterested observer, with knowledge of the essential facts known to and readily ascertainable by the employee, could reasonably conclude that the actions of the government evidence wrongdoing as defined by the WPA." *Id*. at ¶ 7 (citing *LaChance v. White*, 174 F.3d 1378, 1381 (Fed. Cir. 1999)).

### A. Violations of law, rule, or regulation need not be specifically identified.

For an appellant to make a non-frivolous allegation that there was a "violation of law, rule, or regulation," the appellant need not specifically allege a particular kind of fraud, waste, or abuse as defined by the WPA. *See Schneider v. Dep't of Homeland Sec.*, 98 M.S.P.R. 377, ¶ 13 (2005). Instead, under the Board's precedent, "the inquiry into whether a disclosure is protected ends upon a determination that the appellant disclosed a violation of law, rule, or regulation." *Id*. No *de minimis* standard or threshold is required for a disclosure of a "violation of law, rule or regulation." *Id*. An appellant need not identify any specific part of the law, such as the title or number of the statute or regulation, when his statements "clearly implicate an identifiable law, rule, or regulation." *Schneider*, 98 M.S.P.R. 377, at ¶ 13.

An employee is not required to identify a statutory or regulatory provision by title or number when the employee's statements and the circumstances surrounding the making of those statements clearly implicate an identifiable

violation of law, rule, or regulation. *See Langer v. Dep't of Treasury*, 265 F.3d

1259, 1266 (Fed. Cir. 2001). An appellant only needs a reasonable belief that the

conduct violates some law, rule, or regulation. *Sinko v. Dep't of Agr.*, 102 M.S.P.R.

116, ¶ 10 (2006). Even in the absence of a specific citation, it is well settled that a

disclosure may be protected to the extent that it clearly implicates an identifiable

regulation. *See Salinas v. Dep't of the Army*, 94 M.S.P.R. 54, ¶ 8 (2003) (*citing

Langer v. Dep't of Treasury*, 265 F.3d 1259, 1266 (Fed. Cir. 2001).

Although the WPA does not define "rule," the Board has held that it

**includes established or authoritative standards for conduct or behavior**. *See

Rusin v. Dep't of the Treasury*, 92 M.S.P.R. 298 at ¶¶ 15-20 (2002) (emphasis

added) (holding a Department of the Treasury Procurement Instruction

Memorandum and the Bureau of Alcohol, Tobacco, and Firearm's Government

Commercial Credit Card Program qualify as "rules"); *see also Chavez v. Dep't of

Veterans Affairs*, 120 M.S.P.R. 285, 297 (2013); *Drake v. Agency for Int'l Dev.*,

543 F.3d 1377, 1382 (Fed. Cir. 2008); *LaChance*, 174 F.3d at 1381.

> **B.    Gross mismanagement is a management action or inaction that may significantly impact an agency's ability to accomplish its mission; and abuse of authority is a fact-driven inquiry.**

The Board defines "gross mismanagement" as "a management action or

inaction that creates a substantial risk of significant adverse impact on the agency's

ability to accomplish its mission." *Fisher*, 108 M.S.P.R. 296, at ¶ 9 (citing *Shriver*

25

*v. Dep't of Veterans Affairs*, 89 M.S.P.R. 239, ¶ 7 (2001)). Such actions are "more than *de minimis* wrongdoing or negligence." *Id*. Disclosures of "gross mismanagement" must have an "element of blatancy." *Id*.

Likewise, the Board defines an "abuse of authority" as "an arbitrary or capricious exercise of power by a federal official or employee that adversely affects the rights of any person or that results in a personal gain or advantage to himself or to preferred other persons." *Id*. at ¶ 9 (citing *Wheeler v. Dep't of Veterans Affairs*, 88 M.S.P.R. 236, ¶ 13 (2001)).

The Board does not recognize a *de minimis* standard or threshold for what constitutes an "abuse of authority." *Wheeler*, 88 M.S.P.R. 236, ¶ 13. A determination as to whether an appellant has properly pled a non-frivolous allegation of "abuse of authority" is a fact-driven inquiry which examines whether a disinterested person with access to the facts known by the appellant could reasonably conclude that there was an abuse of authority. *Id*.

### C.  Three factors are considered in determining whether a disclosure involves a substantial and specific danger to public health or safety.

When determining whether a disclosure involves harm to public safety or health, the following factors are considered: "(1) the likelihood of harm resulting from the danger; (2) when the alleged harm may occur; and (3) the nature of the harm, i.e., the potential consequences." *Chambers v. Dep't of the Interior*, 602

F.3d 1370, 1376 (Fed. Cir. 2010) (finding that a U.S. Park Police chief informing a newspaper reporter that traffic incidents had increased on a parkway resulting from a diversion of officers was a disclosure evidencing substantial and specific danger to public safety under the WPA). But an employee can also satisfy his burden by showing past harm. *See id.*

**D.    The Board erred in finding Besanceney did not make any protected disclosures under the WPA.**

The Board erred in determining that none of Besanceney's disclosures regarding the mishandling of the LGA baggage theft investigation and Vasey's abuse of authority are protected disclosures under the WPA.

**E.    The Board erred when it determined that Besanceney's reports of the mishandled LGA theft investigation are not protected disclosures under the WPEA.**

The Board erred in finding that the five disclosures made by Besanceney in relation to the LGA baggage theft investigation were not protected disclosures under the WPEA. The evidence demonstrates Besanceney had a good faith belief that Williams and Vasey were violating rules, regulations, and the law when they pressured him to obtain federal search warrants, based on probable cause, when no probable cause existed; and that Williams and Vasey subsequently risked public safety and abused their authority. Besanceney reported his protected concerns five times: 1) during the December 5, 2016, discussion with Williams and Vasey

27

regarding the lack of probable cause;[1] 2) during Besanceney's April 2, 2017,

quarterly review when he again reported Williams and Vasey's mishandling of the

LGA theft investigation; 3) during Besanceney's July 25, 2017, mid-year review

when he again disclosed Williams and Vasey's mishandling of the LGA theft

investigation; 4) in his September 11, 2017, email to Bobo; and 5) in his November

16, 2017, response to the Notice of Proposed Removal.

The Board determined that Besanceney's December 5, 2016, disclosures to

William and Vasey regarding their failure to recognize and apply the proper

standard for probable cause and their attempts to pressure him to falsely claim

probable cause existed, and the associated failure to conduct consent searches of

the suspects' homes, did not constitute a protected disclosure. The Board justified

this determination by characterizing the conversations between Besanceney and his

managers as a "general philosophical or policy disagreement with agency

decisions" and merely a "discussion among employees or supervisors regarding

different possible courses of action." Appx15. In determining that the December 5,

2016, discussion was a philosophical or policy disagreement, the Board cited *Webb*

*v. Dep't of Interior*, No. DA-1221-14-0006-W-1, 2015 WL 150466 (M.S.P.B. Jan.

13, 2015). In *Webb*, the Board held that an employee's authoring of a position

---

[1]    Disclosures made to the alleged wrongdoer are covered under the WPEA.
*Day v. Department of Homeland Security*, 119 M.S.P.R. 589 (2013).

paper disputing the restructuring of his department was not protected activity. *Id.* at 252. The Board determined that the policy paper contained no allegations that the restructuring would result in personal gain to any person involved in the expenditure of federal funds and constituted only "his disagreements with debatable management decisions." *Id.* at 252 no. 3.

While determining whether there is sufficient probable cause for a search warrant may be "debatable," it is not merely philosophic, nor is it a question of workplace policy. It is a legal standard created by the Constitution of the United States and further defined by the Supreme Court. *See* U.S. CONST. amend. IV. The Supreme Court has articulated that to determine whether probable cause exists, the Court should "examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003). A dispute regarding the appropriate level of evidence necessary to satisfy this burden does not fall under the umbrella of disagreement with Vasey and Williams regarding policy decisions of the department.

Besanceney, as the objectively reasonable officer placed in charge of the investigation, did not believe the available evidence created probable cause sufficient to obtain a search warrant. Appx975. Rather, he believed the evidence never rose above the standard of reasonable suspicion because there was no

evidence as to where the stolen items were taken after they were stolen. Appx978. There was no surveillance of the stolen items after the items left the LaGuardia baggage room. Appx976.

Besanceney has almost forty years of experience in law enforcement. Appx948-951. He worked for the U.S. Secret Service for twenty years prior to joining the TSA in 2003 and has extensive experience obtaining criminal warrants and conducting consent searches. Appx948-951.

The Board erred when considering the reasonableness of Besanceney's determination that there was not probable cause. Specifically, the Board stated "the appellant is not a lawyer, but reached this legal conclusion, rather than allowing the AUSA or ADA to do so." Appx13. But the Supreme Court has held that when "dealing with probable cause . . . as the very name implies, we deal with probabilities. These are not technical; **they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act**." *Illinois v. Gates*, 462 U.S. 213, 231 (1983) (internal citations omitted) (emphasis added). Besanceney had not only a good faith belief, but an objectively reasonable belief, that no probable cause existed to support a search warrant without evidence as to where the stolen objects were taken.

To obtain a warrant to search private property, an officer must typically sign an affidavit attesting to his personal knowledge of the facts and represent that he

believes there is sufficient probable cause to search private property. *United States v. Harris*, 403 U.S. 573 (1971). The Supreme Court has held that suppression of evidence in a criminal trial is appropriate if "the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." *United States v. Leon*, 468 U.S. 897, 926 (1984).

Moreover, requiring Besanceney to sign an affidavit falsely attesting to his "belief" of probable cause could subject him to both civil and criminal penalties. *S.H. v. D.C.*, 270 F. Supp. 3d 260, 284 (D.D.C. 2017) (holding that an officer who signed an affidavit seeking a warrant without probable cause was not entitled to qualified immunity against suit, but fellow officers who only executed the warrant were immune). Even Williams and Vasey do not argue there was an "objectively reasonable belief in the existence of probable cause." Williams testified *only* that he "could have made an articulation that there was probable cause" for search warrants, but expressly stopped short of making the assertion that there *was* probable cause. Appx1191.

The rules or regulations being violated by Williams and Vasey include, but are certainly not limited to, both the Fourth Amendment and 18 U.S.C. § 1621 ("Whoever . . . in any declaration, certificate, verification, or statement under penalty of perjury [. . .] willfully subscribes as true any material matter which he

does not believe to be true [. . .] is **guilty of perjury and shall, except as otherwise expressly provided by law, be fined under this title or imprisoned not more than five years, or both**.") (emphasis added). Asking Besanceney to defy these laws is a clear violation of established or authoritative standards for conduct or behavior for TSA officers and supervisors.

Besanceney had a clearly reasonable belief that 1) signing a dishonest affidavit to obtain a search warrant was illegal and improper; and 2) even if he were to obtain such a search warrant without an affidavit, executing it could result in constitutional infringements and suppressed evidence. The Board, when determining that Besanceney's December 5, 2016, conversation with Williams and Vasey was not a protected disclosure, analyzed only whether "strategies" were discussed during this meeting to validate some type of policy or investigative debate. Appx14-15. But the analysis properly turns on Besanceney's reasonable belief that executing his supervisors' plan would result in overt violations of the law and forcing him to do so (or face retaliatory consequences) is, in fact, a violation of TSA policy and rules.

The Board's conclusion that Besanceney's disclosures did not address violations of regulations, rules, and laws does not reflect the full record as to the consequences of Vasey and Williams's actions. Rather, the Board accepted without further inquiry or consideration that Besanceney was obligated to sign such an

affidavit or generally obtain a warrant, without any mention of the Fourth Amendment or rights afforded to Besanceney.

And the Board erred when it explicitly pointed to the fact that Besanceney did not cite a specific rule or regulation. Appx21 ("Not only is his assertion of no arrest inaccurate, the appellant did not cite to any specific 'proper and correct investigative decision,' rule, regulation or procedure that was not followed."). This consideration is improper as a matter of law; an appellant need not identify any specific part of the law, such as the title or number of the statute or regulation, when his statements "clearly implicate an identifiable law, rule, or regulation." *Schneider*, 98 M.S.P.R. 377, at ¶ 13. The Board plainly erred in ruling Besanceney's disclosures were not protected, as this consideration was not in accordance with the law. Moreover, when considering the four disclosures made outside of the December 5, 2016, meeting, the Board entirely fails to address the reasonableness of Besanceney's beliefs, and entirely fails to analyze the viewpoint of a "disinterested observer," thus ultimately failing to engage in the proper analysis set out under the WPA. Appx15-23.

Gross mismanagement is also evident based on the facts set out above. When holding that the December 5, 2016, disclosure to Williams and Vasey did not qualify as a protected disclosure of "gross mismanagement," the Board determined that Williams and Vasey's decision to cancel consent searches was not

33

gross mismanagement. Appx22. As a matter of law, the Board's analysis turned on the incorrect issue; the proper consideration is whether their decision to pursue search warrants at that point in the investigation with insufficient probable cause constitutes gross mismanagement, not their rejection of consent searches.

Any evidence obtained from searches based on faulty warrants could have been fruit of the poisonous tree. *United States v. Calandra*, 414 U.S. 338, 354 (1974). To rise to the level of gross mismanagement, the management's action or inaction must create a substantial risk of significant adverse impact upon the agency's ability to accomplish its mission. *Johnson v. Dep't of Justice*, 104 M.S.P.R. 624, ¶ 16 (2007). The TSA's mission is to "[p]rotect the nation's transportation systems to ensure freedom of movement for people and commerce." TRANSPORTATION SECURITY AGENCY, https://www.tsa.gov/about/tsa-mission (last visited Oct. 31, 2018). Properly obtaining evidence and successfully prosecuting suspects is critical to the success of this mission; here, those efforts were brought to an abrupt halt when investigators circumvented proper legal procedure. *See, e.g.*, *Illinois*, 462 U.S. at 231; *Leon*, 468 U.S. at 926.

Further, Vasey and Williams went on to ignore Besanceney's urgings to follow proper procedure. Should the Court find that the December 5, 2016, disclosure to Williams and Vasey did not implicate "blatant" mismanagement, it is plain that Besanceney's disclosures following this conversation did address the

blatancy and willfulness of Vasey and Williams's failures. A disinterested observer, especially one with federal law enforcement experience, should understand the importance of probable cause and legitimate search warrants as a matter of public trust and constitutional rights. By impressing upon Vasey and Williams that there was no probable cause, and thus no justifiable search, Besanceney disclosed his supervisors' gross mismanagement five separate times, all of which were protected under the WPA.

Asking Besanceney to obtain such a warrant also created substantial danger to health or safety. By executing a faulty warrant without probable cause, Vasey and Williams could have endangered both TSA personnel and the individuals unknowingly subject to search. Consideration of TSA staff and law enforcement safety is a hallmark of criminal law, and is to be studiously protected. *Riley v. California*, 573 U.S. 373 (2014) (discussing Fourth Amendment exemptions for law enforcement officers resulting from imminent safety concerns). However, the individuals inside the home are also at risk during the execution of a warrant, and even more so if there is no probable cause of criminal action (demonstrating a higher uncertainty of actual culpability). Permitting law enforcement agencies to coerce investigators to sign affidavits, or even simply obtain warrants, without proper basis, results in a number of people being put in unnecessary danger.

Finally, Vasey and Williams abused their authority when repeatedly pushing for federal search warrants to their own benefit. Rather than seek a search warrant themselves (notably, thus incurring liability by signing an affidavit attesting to probable cause), they instead pressured a subordinate to do so by threatening punitive action—and then subjected him to retaliatory actions by substantially increasing his workload, refusing to approve numerous reports for vague or contradictory administrative reasons, and requiring Besanceney to revise and resubmit the same reports multiple times. This culminated in a Memorandum of Counseling, an Improvement Period Notice, and a Proposed Removal.

In addition, Besanceney's rights are not the only rights adversely affected by Williams and Vasey's supervisory decisions; by maintaining that search warrants (without probable cause) were the correct way to proceed, Vasey and Williams ignored the Fourth Amendment rights of the accused. More succinctly, Vasey and Williams arbitrarily exercised their power as federal officials in a way that adversely affected both Besanceney and private citizens. Besanceney's disclosures regarding their mishandling of legal and investigatory procedures are therefore also protected as disclosures addressing their abuses of authority. The Board erred when not acknowledging any of the facts surrounding Vasey and Williams's abuse of authority, and erred by failing to acknowledge the rights of any individuals outside of the TSA.

**F.    The Board erred when it determined Besanceney's reports of Vasey's abuse of authority are not protected disclosures under the WPEA.**

Besanceney made three protected disclosures regarding Vasey's abuse of authority as a federal law enforcement officer: (1) Besanceney's February 6, 2018, disclosure of Vasey's abuse of authority to both Williams and Vasey; Besanceney's February 12, 2018, disclosure of Vasey's abuse of authority to the Special Investigations Unit; and Besanceney's March 7, 2018, disclosure of Vasey's abuse of authority to the Office of Inspector General.

When concluding that Besanceney's reports of Vasey's abuse of authority are not protected disclosures, the Board held that

> He testified he did not ask his unnamed sources how they acquired their information about Vasey. Moreover, even though his sources gave him the names of potential witnesses, the appellant did [sic] contact these individuals in an effort to obtain additional information. As such, I find the appellant did not possess a reasonable belief that Vasey had engaged in the domestic abuse and stalking incidents the appellant ostensibly disclosed. Rather, these disclosures were based on mere rumors, which are [sic] the type of disclosure the WPA protects.

Appx27.

This analysis is reversible in several ways. First, the Board wrongly expects Besanceney to perform his own investigation as to the full veracity of these claims, rather than apply the proper standard of having a reasonable belief that this is an abuse of authority by a federal officer. It is Besanceney's duty to report off-duty

misconduct, particularly misconduct committed by managers, but it is not his duty to investigate these allegations. Appx1103.

Further, the Board fails to analyze the evidence contributing to Besanceney's reasonable belief of abuse of authority beyond "limited information he obtained from unnamed sources." Appx27. Supporting the contention that rumors are unprotected by the WPA, the Board cites to *Johnson v. Dep't of Justice*, No. DC-1221-06-0388-W-1, 2007 WL 447155 (M.S.P.B. Feb. 6, 2007). In *Johnson*, the plaintiff reported a "fight" at the holiday party, with no specific source (even an unnamed source); he simply asserted the fight was "known by everyone." *Id.* at 633. The plaintiff did not even know who was involved in this fight. *Id.*

Besanceney had two separate credible sources for his allegations, and even later received an unsigned copy of Vasey's divorce proceedings evidencing Vasey's alleged assault on his ex-wife. Appx1097-1098. Typically, in the investigative process, law enforcement officials are given heightened credibility. For example, a magistrate judge may rely on a law enforcement officer's knowledge of someone's reputation when issuing a warrant. *Harris*, 403 U.S. 573, 583 (1971). Besanceney has been in law enforcement for forty years. When someone with his experience confirms that he has two separate, credible sources from which his information is derived, it is likely that these allegations are more than "rumors."

38

A disinterested observer, upon review of two credible sources of information provided by someone with forty years of law enforcement experience, would reasonably conclude that this amounts to a report of wrongdoing (thus constituting protected activity under the WPA). Instead, the Board determines there are no facts "known to and readily ascertainable to Besanceney," improperly dismissing both his sources and credibility as an officer. Appx27.

Besanceney's final protected disclosure addressed his belief that Williams and Vasey had surreptitiously and unlawfully audio recorded personnel meetings between Williams, Vasey, and Besanceney. Appx582, Appx621. Given Williams and Vasey's observed failure to take notes during their personnel meetings with him, and the unusual level of detail captured in the memo prepared by his supervisors regarding Besanceney's July 2017 meeting with them, Besanceney had a reasonable belief that either Williams or Vasey had surreptitiously recorded the personnel meetings. Whereas notes from the April 2017 meeting consisted of less than half a page of general information in bullet point, notes from Besanceney's July 2017 meeting consisted of four pages of notes with bullets, sub-bullets, and direct quotes. Besanceney knew that covertly recording personnel meetings was prohibited by TSA policy, as well as Massachusetts and Pennsylvania law.

The Board ruled that Besanceney could not have had a reasonable belief that this disclosure revealed misconduct because "he had no proof of being audio

recorded." Appx27. However, "[n]owhere in the WPA did Congress place a burden of proof on an appellant in an IRA appeal to provide 'irrefragable' proof to rebut a presumption that, in the matter at issue, agency officials performed their duties correctly, fairly, in good faith, and in accordance with law." *White v. Dep't of Air Force*, No. DE-1221-92-0491-M-4, 2003 WL 22175176 (M.S.P.B. Sept. 11, 2003), *aff'd*, 391 F.3d 1377 (Fed. Cir. 2004). Moreover, "both the statutory language and the legislative history of the WPA indicate that the reasonable belief test is the only relevant inquiry in determining whether a particular disclosure is protected." *Id.* (internal citations omitted).

Again, the Board does not address Besanceney's reasonable belief or even why he believed he was being recorded; there is no evidence that the Board considered or even acknowledged the abnormally detailed July 2017 memo, nor considered whether a disinterested observer would consider this a report of wrongdoing. As the Board failed to address certain facts altogether, as well as failed to apply the appropriate test to Besanceney's beliefs, it erred in finding that this disclosure was unprotected.

**G.    The Board further erred in not considering the prohibited personnel practices taken against Besanceney by TSA or the causal link between those actions and his protected disclosures.**

As discussed above, the Board erred in finding Besanceney made no protected disclosures related to Williams and Vasey's gross mismanagement, abuse of authority, danger to public health or safety, and violation of rules, laws, and regulations. After incorrectly reaching this conclusion, the Board failed to analyze the prohibited personnel actions to which TSA subjected Besanceney—namely, the Memorandum of Counseling, the Improvement Period Notice, and the Proposed Removal; and failed to analyze the causal link between his disclosures and those actions.

In the burden shifting scheme for whistleblower cases, an employee must prove by a preponderance of the evidence that he made a protected disclosure that was a contributing factor to an adverse action. *Whitmore v. Dep't of Labor*, 680 F.3d 1353, 1364 (Fed. Cir. 2012).  The burden of persuasion then shifts to the agency to show by clear and convincing evidence that it would have taken the same personnel action in the absence of such disclosure. *Id.; see also Carr v. Soc. Sec. Admin.*, 185 F.3d 1318, 1322 (Fed. Cir. 1999).

A "contributing factor" is "**any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision**." *See Marano v. Dep't of Justice*, 2 F.3d 1137, 1140 (Fed. Cir. 1993) (emphasis in

41

original) (quoting 135 Cong. Rec. 5033 (1989) (Explanatory Statement on S. 20)). "This substantial reduction of the whistleblower's burden" means that "**any weight**" given to a protected disclosure can satisfy the "contributing factor" test. *See id.* (emphasis added).

An employee may demonstrate that a disclosure was a contributing factor in the covered personnel action through circumstantial evidence, such as the acting officials' knowledge of the disclosure and the timing of the personnel action. *Benton-Flores v. Dep't of Def.*, No. DC-1221-13-0522-W-1, 2014 WL 3748419 (M.S.P.B. July 31, 2014). Thus, an appellant's submission of evidence that the official taking the personnel action knew of the disclosure and that the personnel action occurred within a period of time such that a reasonable person could conclude that the disclosure was a contributing factor in the personnel action, is evidence sufficient to meet the knowledge-timing test, and satisfies the contributing factor standard. *Id*.

Besanceney's protected activities contributed to the adverse personnel actions that escalated over the course of his employment with TSA. The time between each of Besanceney's protected activities and the corresponding personnel action is substantially less than six months, which is "sufficiently proximate" to satisfy the timing prong of the knowledge- timing test. *See Benton-Flores*, 121

M.S.P.R. 428, ¶ 13 (citing *Rubendall v. Dep't of Health & Human Servs.*, 101 M.S.P.R. 599, ¶ 13 (2006)).

Though unacknowledged by the Board, Besanceney established that his protected activities were a contributing factor in the personnel actions taken against him.

TSA took numerous actions against Besanceney because of his protected disclosures and protected activities; as evidenced by the close temporal proximity of the adverse actions to the protected activity, and the pretextual nature of TSA's justifications for its actions, Besanceney's protected activity was a contributing factor.

After Besanceney first objected to Williams and Vasey's orders and management of the LGA Baggage Room 11 Thefts investigation, TSA substantially increased his workload, refused to approve numerous reports for vague or contradictory administrative reasons, and required Besanceney to revise and resubmit the same reports multiple times. First, TSA, through Williams, issued Besanceney a Memorandum of Counselling over case deadlines and reporting. As Williams and Vasey continued to move the goalposts on Besanceney's deliverables, they ultimately issued Besanceney a retaliatory Improvement Period Notice. After his supervisors falsely determined Besanceney had not met the requirements of the IPN, Williams proposed Besanceney's removal from Federal

service. Ultimately, Deputy Director Bobo overruled the proposed removal, but kept Besanceney in Williams and Vasey's chain of command.

### H. The Board erred in not considering or analyzing whether TSA met its heavy burden to show by clear and convincing evidence that it would have taken the same personnel actions in the absence of Besanceney's disclosures.

TSA did not meet its heavy burden under the WPA to demonstrate it would have subjected Besanceney to punitive action in the absence of his protected whistleblowing—and the Board, as already discussed, erred in not finding any of Besanceney's disclosures protected, as well as failed to address them as a contributing factor for TSA's prohibited personnel actions.

When determining whether an agency has shown by clear and convincing evidence that it would have taken the same personnel action in the absence of whistleblowing, this Court will consider the following factors: (1) the strength of the agency's evidence in support of its personnel action; (2) the existence and strength of any motive to retaliate on the part of the agency officials who were involved in the decision; and (3) any evidence that the agency takes similar actions against employees who are not whistleblowers but who are otherwise similarly situated. *Carr*, 185 F.3d at 1323.

"Clear and convincing" evidence is evidence which produces in the mind of the trier of fact an abiding conviction that the truth of a factual contention is "highly probable." *Miller v. Dep't of Justice*, 842 F.3d 1252, 1257-58 (Fed. Cir.

44

2016).  The clear and convincing burden of proof imposes a heavier burden upon

an agency than that imposed by requiring proof by preponderant evidence but a

somewhat lighter burden than that imposed by requiring proof beyond a reasonable

doubt.  *Id.*  This Court reviews the Board's finding of independent causation

for substantial evidence.  Appx1258.

"Substantial evidence . . . means such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion." *Consol. Edison Co. of

N.Y. v. NLRB*, 305 U.S. 197, 229 (1938).  "The substantiality of evidence must take

into account whatever in the record fairly detracts from its weight." *Jacobs v.

Dep't of Justice*, 35 F.3d 1543, 1546 (Fed. Cir. 1994).  "Any determination by an

AJ that is based on findings made in the abstract and independent of the

evidence which fairly detracts from his or her conclusions is unreasonable and, as

such, is not supported by substantial evidence." *Whitmore*, 680 F.3d at 1376.  The

Board must provide an in-depth review and full discussion of the facts to explain

its reasoning, including consideration of countervailing evidence presented by

the employee. *Agoranos v. Dep't of Justice*, 602 Fed. Appx. 795, 801 (Fed. Cir.

2015) (emphasis added).

The record demonstrates that TSA did not meet its burden to show by clear

and convincing evidence that it would have taken the same personnel actions in the

absence of Besanceney's disclosures; and the Board erred in not considering or analyzing whether TSA met this heavy burden.

## CONCLUSION

Besanceney had a good faith belief that Williams and Vasey were violating rules, regulations, and the law when they pressured him to obtain federal search warrants, based on probable cause, when no probable cause existed; and Besanceney reported his protected concerns five times (on December 5, 2016, April 2, 2017, July 25, 2017, September 11, 2017, and November 16, 2017).

Besanceney did not believe the available evidence created probable cause sufficient to obtain a search warrant; and signing an affidavit falsely attesting to his "belief" of probable cause could have subjected him to both civil and criminal penalties. Besanceney had a reasonable belief that 1) signing a dishonest affidavit to obtain a search warrant was illegal and improper; and 2) even if he were to obtain such a search warrant without an affidavit, executing it could result in constitutional infringements and suppressed evidence.

Besanceney also reasonably believed Vasey had engaged in off-duty misconduct (constituting an abuse of authority) that Besanceney was required to report—and which he did report. And Besanceney reasonably believed Vasey or Williams recorded a July 2017 meeting without his knowledge or consent; the

memo he received following the meeting was much too detailed to have been based on recollection or notes made after the meeting. Besanceney reported his reasonable belief of an illegal audio recording to Bobo and later to TSA's Special Investigations Unit and Office of Inspector General—after first discussing it with Vasey and Williams. He thus made additional protected disclosures on February 6, 2018, February 12, 2018, and March 7, 2018.

The Board did not address Besanceney's reasonable belief or even why he believed he was being recorded; there is nothing in the Board's decision to indicate the Board considered or even acknowledged the unusually detailed July 2017 memo, nor considered whether a disinterested observer would find this a report of wrongdoing. As the Board failed to address certain facts altogether, as well as failed to apply the appropriate test to Besanceney's beliefs, it erred in finding that these disclosures were unprotected.

The Board further erred in not considering the adverse actions taken against Besanceney by TSA or the causal link between those actions and his protected disclosures. Besanceney's protected activities contributed to the adverse personnel actions that escalated over the course of his employment with TSA. The time between each of Besanceney's protected activities and the corresponding personnel action is substantially less than six months, which is "sufficiently proximate" to satisfy the timing prong of the knowledge-timing test. Though unacknowledged by

the Board, Besanceney established that his protected activities were a contributing factor in the personnel actions taken against him.

Finally, the Board erred in not considering or analyzing whether TSA met its heavy burden to show by clear and convincing evidence that it would have taken the same personnel actions in the absence of Besanceney's disclosures.

Besanceney respectfully requests this Court reverse and vacate the Board's Final Order and find Besanceney engaged in one or more protected disclosures; find that he established one or more of his protected disclosures were a contributing factor in the adverse actions taken against him by TSA; find TSA failed to prove by clear and convincing evidence it would have taken the same actions in the absence of Besanceney's protected whistleblowing; and remand this matter to the Board for judgment in Besanceney's favor and all appropriate remedies, including compensatory damages for the emotional distress and reputational harm caused by TSA.

Besanceney respectfully requests this Court reverse and vacate the Board's Final Order and find Besanceney engaged in one or more protected disclosures; find that he established one or more of his protected disclosures were a contributing factor in the adverse actions taken against him by TSA; find TSA failed to prove by clear and convincing evidence it would have taken the same actions in the absence of Besanceney's protected whistleblowing; and remand this

matter to the Board for judgment in Besanceney's favor and all appropriate remedies, including compensatory damages for the emotional distress and reputational harm caused by TSA, and his attorney's fees. In the alternative, Besanceney respectfully requests that the Court vacate the Board's Final Order and remand for reconsideration with an instruction that Besanceney engaged in protected activity.

Respectfully submitted,

/s/ John T. Harrington
R. Scott Oswald
John T. Harrington
THE EMPLOYMENT LAW GROUP, P.C.
1717 K Street NW, Suite 1110
Washington, D.C.  20006
(202) 261-2830
(202) 261-2835 (facsimile)
soswald@employmentlawgroup.com
tharrington@employmentlawgroup.com

*Counsel for Petitioner Mark Besanceney*

# **ADDENDUM**

# <u>TABLE OF CONTENTS</u>

<u>**Pages**</u>

Initial Decision of
The United States Merit Systems Protection Board
Re:  Denying Appellant's Request for Corrective Action
      filed September 27, 2021 ........................................................................Appx1

**UNITED STATES OF AMERICA**
**MERIT SYSTEMS PROTECTION BOARD**
**NORTHEASTERN REGIONAL OFFICE**

| | |
|---|---|
| MARK BESANCENEY,<br> Appellant, | DOCKET NUMBER<br>PH-1221-19-0255-M-1 |
| v. | |
| DEPARTMENT OF HOMELAND<br> SECURITY,<br> Agency. | DATE: September 27, 2021 |

John T. Harrington, Esquire, Washington, D.C., for the appellant.

R. Scott Oswald, Esquire, Washington, D.C., for the appellant.

Sheila J. Callahan, Philadelphia, Pennsylvania, for the agency.

Stephanie C. Blum, Esquire, Romulus, Michigan, for the agency.

**BEFORE**
Kara Svendsen
Administrative Judge

**INITIAL DECISION**

On May 8, 2019, Mark Besanceney, the appellant, timely filed an individual right of action (IRA) appeal with the Merit Systems Protection Board (Board) under the Whistleblower Protection Act (WPA), as amended by the Whistleblower Protection Enhancement Act (WPEA), in which he alleged that the Department of Homeland Security, Transportation Security Administration (TSA or agency), retaliated against him for his alleged whistleblowing activities. Initial Appeal File (IAF), Tab 1. In an initial decision (ID) dated April 9, 2020, I

dismissed the appeal for lack of jurisdiction without holding the appellant's requested hearing. IAF, Tab 36.

On June 10, 2020, the appellant filed a petition for review with the U.S. Court of Appeals for the Federal Circuit. *See Besanceney v. Department of Homeland Security*, MSPB Docket No. PH-1221-19-0255-L-1, Litigation File (LF), Tab 1. Based on its decision in *Hessami v. Merit Systems Protection Board*, 979 F.3d 1362 (Fed. Cir. 2020), by Order dated January 22, 2021, the Court granted the Board's motion to vacate the ID and remanded the appeal for further adjudication. LF, Tabs 13, 14. Pursuant to the Court's Order, the Board docketed this remanded appeal on February 9, 2021. *See Besanceney v. Department of Homeland Security*, MSPB Docket No. PH-1221-19-0255-M-1, Remand File, (RF), Tab 2.

The requested hearing was held on April 27 and 28, 2021. For the reasons set forth below, the appellant's request for corrective action is DENIED.

Background

The appellant began his career with TSA in August 2003 as a Supervisory Criminal Investigator. IAF, Tab 7 at 151. At his request, in May 2015, the appellant was transferred to an assignment at the John F. Kennedy Airport (JFK) in New York City. *Id*., Tab 1 at 9. At JFK, he was a Special Agent assigned to TSA's Investigations Division (INV) in the Philadelphia Field Office. *Id*., Tab 6 at 7. His first-line supervisor was Jeffrey Vasey, Deputy Supervisory Agent in Charge (DSAC), and Thomas Williams, Supervisory Agent in Charge (SAC), was his second-line supervisor. *Id*.

Vasey began his federal service with the Secret Service in April 1976. In September 1998, he began working for the Department of Justice (DOJ) in their Office of Inspector General. Vasey entered on duty with TSA on October 10, 2010 as a DSAC for the Philadelphia Field Office. He retired from TSA on September 29, 2018. RF, Tab 12 (Hearing Testimony, Day 2; Vasey, track 1); IAF, Tab 32 at 54-55.

Williams worked for the federal government in various law enforcement positions from 1990 until 2005. He then went to work in the private sector as a computer forensics consultant. After returning to federal employment in 2012, Williams was hired by TSA as a SAC for the Northeast Region in May 2015, a position which continued to hold as of the date of his testimony. RF, Tab 11 (track 6).

In late July 2016, a JetBlue Airways corporate security investigator notified the appellant about the theft of personal property from checked baggage belonging to JetBlue passengers departing from LaGuardia Airport (LGA). IAF, Tab 1 at 10; Tab 28 at 62-63. As a result, at the appellant's request, TSA installed a camera in LGA Baggage Room 11. Over the next several weeks, at least seven instances of pilferage were recorded. *Id.*, Tab 2 at 56-59. With the assistance of a TSA technician who was reviewing the recorded footage, the appellant was able to identify two LGA Transportation Security Officers (TSOs) as suspects. Per agency policy, the two suspects were suspended. *Id.*, Tab 6 at 7; Tab 1 at 10. Thereafter, TSA opened an official investigation and assigned the appellant as the case agent.[1] *Id.*, Tab 2 at 60.

The appellant claimed that in an effort to recover stolen property and facilitate the criminal prosecution of the identified TSO suspects, he developed a plan for a "consent searches" to be conducted on Monday, December 5, 2016. IAF, Tab 7 at 52-55. In the plan, the appellant related that surveillance footage revealed two LGA TSOs repeatedly rummaging through passengers' checked baggage and, on multiple occasions, one TSO removing personal effects from baggage and placing it in the other TSO's backpack. The appellant did not provide the dates of any of these occasions; nor did he provide a description of any of the personal effects purportedly taken. *Id.* Conversely, he did include the

---

[1] Although at his request the appellant was reassigned to Boston, he asked to complete the Room 11 theft investigation. RF, Tab 11 (Hearing Testimony, Day 1, tracks 1, 2).

details provided to him by the JetBlue security officer, 72 complaints involving theft of personal property consisting of sunglasses, clothing, bottles of liquor and perfume and jewelry, for the period of January 2016 through August 2016. *Id*.

According to the agency, the consent searches were not conducted because the appellant did not complete the necessary preliminary investigatory tasks in support of obtaining search warrants. In particular, he had not performed a thorough review of the surveillance footage in an effort to match thefts reported with footage reviewed. IAF, Tab 6 at 7-8; Tab 7 at 34-45. As such, Vasey and Williams determined that the case was not prosecution or warrant ready. *Id*., Tab 7 at 35. Specifically, if the suspects had declined to consent to the searches or speak with investigators, there was insufficient casework completed to obtain a warrant. *Id*.; Tab 2 at 63. Consequently, Vasey and Williams decided not to follow through with the appellant's proposed operations plan. Rather, the appellant was instructed to review the surveillance footage, a process he undertook beginning on December 7, 2016. *Id*., Tab 28 at 73-74.

The appellant completed his review of the footage, and on January 10, 2017 provided Williams with a list of dates and times when items were taken and a description of what occurred and/or what was taken. IAF, Tab 28 at 75-77. Shortly thereafter, at the appellant's request, he was transferred to a satellite office in Boston effective late December 2016. *Id*., Tab 6 at 87, 7, 45; Tab 2 at 69. Subsequently, the LGA theft case was reassigned after a newly hired LGA agent. *Id*., Tab 6 at 87. The two suspects were prosecuted.

The appellant contended that he made several protected disclosures regarding the way the agency handled the LGA baggage room theft case. He also maintained that he made three disclosures regarding Vasey's purported abuse of authority regarding other matters. As a result, he claimed that he was subjected to numerous adverse personnel actions. Thus, on or about June 25, 2018, he filed a complaint with the Office of Special Counsel (OSC). IAF, Tab 2 at 3-29. By letter dated October 18, 2018, OSC advised him that it had made a preliminary

determination to end its investigation, but afforded him the opportunity to submit a written response. *Id*. at 30-31. The appellant submitted a written response to OSC dated October 31, 20l8. *Id*. at 32-35. By letter dated March 4, 2019, OSC informed him that it had closed its investigation into his complaint. The closure letter also notified him of his Board appeal rights. *Id*. at 36-38; 39-40. This timely appeal followed.

<u>Legal standard and burden of proof</u>

The WPA, as amended, prohibits an agency from taking a personnel action against an employee for disclosing information that the employee reasonably believes evidences a violation of law, rule, or regulation; gross mismanagement; a gross waste of funds; an abuse of authority; or a substantial and specific danger to public health or safety. *See Chambers v. Department of the Interior*, 602 F.3d 1370, 1375-76 (Fed. Cir. 2010) (citing 5 U.S.C. § 2302(b)(8)).

Where, as here, there is no independent right to appeal the personnel actions directly to the Board, an aggrieved employee must seek corrective action from OSC prior to seeking corrective action from the Board. 5 U.S.C. § 1214(a)(3); 5 U.S.C. § 1221(a); *Corthell v. Department of Homeland Security*, 123 M.S.P.R. 417, ¶ 7 (2016). Instantly, the appellant satisfied the OSC exhaustion requirement by informing OSC of the nature of his claims and providing OSC a sufficient basis to pursue an investigation that might lead to corrective action. *Ward v. Merit Systems Protection Board*, 981 F.2d 521, 526 (Fed. Cir. 1992); *Linder v. Department of Justice*, 122 M.S.P.R. 14, ¶ 14 (2014). In a subsequent IRA appeal, the scope of the Board's jurisdiction is limited to those disclosures and those personnel actions raised before OSC. *Sazinski v. Department of Housing & Urban Development*, 73 M.S.P.R. 682, 685 (1997).

To prevail in an IRA appeal, an appellant must prove by preponderant evidence that: (1) he engaged in whistleblowing activity by making a protected disclosure, or engaged in other protected activity; and (2) the disclosure or

activity was a contributing factor in the agency's decision to take or fail to take one of the personnel actions listed at 5 U.S.C. § 2302(a). Preponderant evidence is that degree of relevant evidence a reasonable person, considering the record as a whole, would accept as sufficient to find a contested fact is more likely to be true than untrue. 5 C.F.R. § 1201.4(q).

The proper test for determining whether an employee had a reasonable belief that his disclosures revealed misconduct described in 5 U.S.C. § 2302(b)(8) is whether a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the employee could reasonably conclude that the actions of the government evidenced wrongdoing as defined by the WPA. *See Mason v. Department of Homeland Security*, 116 M.S.P.R. 135, ¶ 17 (2011). An appellant's purely subjective opinion is insufficient, even if shared by other employees. *Lachance v. White*, 174 F.3d 1378, 1381 (Fed. Cir. 1999), *cert. denied*, 528 U.S. 11534 (2000).

An appellant also must prove the disclosure was a contributing factor to the personnel action. A "contributing factor" means the disclosure affected the agency's decision to threaten, propose, take, or not take the personnel action regarding the appellant. *See Mudd v. Department of Veterans Affairs*, 120 M.S.P.R. 365, ¶ 10 (2013). An appellant can show that his disclosure was a contributing factor by satisfying the knowledge/timing test, meaning by presenting evidence that the official taking the personnel action was aware of the disclosure, and the official took the action within a short enough period after the disclosure for a reasonable person to conclude that the disclosure was a contributing factor to the personnel action. *See Gonzalez v. Department of Transportation*, 109 M.S.P.R. 250, ¶ 19 (2008).

<u>Evidence and analysis</u>

Regarding the six witnesses who testified at the hearing, I had the opportunity to observe each witness, and have carefully considered his/her

demeanor. *See Hamilton v. Department of Veterans Affairs*, 115 M.S.P.R. 673, ¶ 18 (2011). As discussed below, the various *Hillen* factors were considered in reaching credibility determinations.[2] *Hillen v. Department of the Army*, 35 M.S.P.R. 453, 458 (1987),

*Alleged protected disclosures*

As set forth in his OSC complaint, the appellant alleged his protected disclosures were as follows:

1. On December 5, 2016, he disclosed Williams's and Vasey's "mishandling of the LGA Baggage Room 11 Thefts during the investigation."

2. On April 2, 2017, he disclosed Williams's and Vasey's "mishandling of the LGA Baggage Room 11 Thefts during his quarterly review."

3. On July 25, 2017, he disclosed Williams's and Vasey's "mishandling of the LGA Baggage Room 11 Thefts during his mid-year review."

4. On September 11, 2017, he disclosed Williams's and Vasey's "mishandling of the LGA Baggage Room 11 Thefts via email to Darcy [sic] Bobo," Deputy Director, INV.

5. On November 16, 2017, he disclosed Williams's and Vasey's "mishandling of the LGA Baggage Room 11 Thefts in response to the Notice of Proposed Removal."

6. On February 6, 2018, he disclosed "Vasey's abuse of authority" to Williams and Vasey.

7. On February 12, 2018, he disclosed "Vasey's abuse of authority" to the agency's Special Investigations Unit (SIU).

8. On March 7, 2018, he disclosed "Vasey's abuse of authority" to the agency's Office of Inspector General (OIG).

IAF, Tab 2 at 22-23.

---

[2] The factors are: (1) the witness's opportunity and capacity to observe the event or act in question; (2) the witness's character; (3) any prior inconsistent statement by the witness; (4) a witness' bias, or lack of bias; (5) the contradiction of the witness's version of events by other evidence or its consistency with other evidence; (6) the inherent improbability of the witness's version of events; and (7) the witness's demeanor. *Hillen*, 35 M.S.P.R. 453 at 458.

1. <u>Mishandling of the LGA theft investigation</u>

The appellant's first five purported disclosures all related to Vasey's and Williams's alleged mishandling of the LGA theft investigation. Again, the theft was brought to the appellant's attention by a JetBlue security office in July 2016. In an email sent to the appellant on November 7, 2016, the JetBlue security office identified one instance of theft of clothing from baggage. IAF, Tab 28 at 62-63. Two weeks later, the appellant received the following email, "Unfortunately pilferage is trending up again at LGA; a breakdown of the latest incidents is below. Please let me know when you think the camera footage can be reviewed." The email also included an itemized list of seven instances of baggage theft. *Id*. at 61-62. Two days later, by email dated November 23, 2016, the JetBlue security officer provided additional information regarding what had been stolen on each occasion. *Id*. at 60-61.

As he was obligated to do, the appellant notified TAS management of the thefts. He then met with Robert Duffy, Federal Security Director, regarding the thefts on November 23, 2016, the day before Thanksgiving. RF, Tab 11 (track 1). Per agency policy, the suspects were indefinitely suspended, which the appellant believed put the suspects on notice of the investigation. It was evident from the appellant's tone that although he was aware of this "zero tolerance" policy (*see* IAF, Tab 7 at 29), he did not agree with it. As explained by Williams, however, if the suspects were stealing from passengers, TSA could not allow them to continue working in the baggage room. RF, Tab 11 (track 6).

In the interim, by email dated November 21, 2016, the appellant advised Williams and Vasey that he had identified two suspects. He further stated:

> We will aim to download video from the camera early next week to identify additional thefts based on video and theft complaints. I am working with JetBlue security to have PAX [passengers] provide photos of bags from which thefts occurred. (Management will need PAX statements before preparing termination paperwork if arrests cannot be made.)

IAF, Tab 28 at 57.  The following week, on November 30, 2016, in an email copied to Vasey, the appellant noted he was working with JetBlue in an effort "to get more descriptions of property from incidents going back to the first of the year." *Id*. at 60.  In response, by email, Vasey directed the appellant to obtain search warrants for the residences of the two suspects.  *Id*.  Vasey did not copy Williams on this email.

The appellant admittedly made no effort to obtain search warrants.  Nor did he ever advise Vasey that he did not intend to do so.  He testified that he did not seek search warrants because no one knew where the stolen items went.  He asserted that TSA had to know where the stolen items had been taken after they were removed from Room 11 in order to obtain a search warrant.  RF, Tab 11 (track 1).  Thus, in his opinion, there was insufficient probable cause to obtain the warrants.  *Id*.  On cross-examination, the appellant begrudgingly admitted that he did not share this belief with Vasey, or Williams, until after December 5, 2016.  *Id*. (track 3).  He attempted to justify his actions by asserting, "They [Vasey and Williams] never explained to me why search warrants were warranted" (*id*.), as though his first- and second-line supervisors were required to justify the lawful directive they issued to him.[3]  He admitted he ignored the emails about search warrants because he disagreed with Vasey and Williams and, "They never gave me the courtesy of using my knowledge, skills and abilities." *Id*.

By email dated December 2, 2016, Vasey formally assigned the LGA baggage theft case was to the appellant.  IAF, Tab 28 at 64-66.  The next day, a Saturday, ignoring Vasey's directive, the appellant sent an email to Williams indicating as follows: "Affirmative.  Consent searches.  Perhaps we can leverage

---

[3] The appellant admitted that neither Vasey nor Williams ever instructed him to break the law or lie to a prosecutor or judge in an effort to obtain the search warrants.  He further admitted that it was lawful for Vasey and Williams to ask him, an investigator, to talk to a prosecutor about obtaining a search warrant.  RF, Tab 11 (tracks 3, 4).

cooperation against staying out of jail and future employment." *Id*. at 69.  It is not clear what the appellant was responding to in the affirmative or if there was more text as email appears to be cut off.  *Id*.; *see also*, Tab 24 at 80.  What is clear is the appellant's disregard for Vasey's instruction to seek search warrants.

Two minutes later, at 11:03 a.m., Williams emailed the appellant as follows, "We need to have an AUSA [Assistant United States Attorney] or ADA [Assistant District Attorney] on speed dial in case they pull a 'no one gets in to see the Wizard,'" meaning if the suspects did not consent to their residences being searched, TSA would contact a law enforcement official in an attempt to obtain search warrants.  IAF, Tab 28 at 69; RF; Tab 11 (track 7).  In his reply email, sent immediately thereafter, the appellant again failed to express his belief that there was insufficient probable cause necessary to obtain search warrants. Rather, he responded that he would connect with local ADA on Monday morning, the morning of the planned searches.  *Id*., Tab 28 at 69.  Williams responded, "Perfect!  Thanks Mark."  *Id*. at 68.

One minute before this response, at 11:05 a.m., Williams sent an email to area TSA agents, including Vasey and the appellant, alerting them that they were "likely to visit some suspects on Monday in NYC [New York]" and that "[i]t may involve consent searches or the execution of search warrants at 2 locations."  *Id*. at 71.  Williams further noted that the agents should have their body armor and other law enforcement items with them.  *Id*.

Next, on Saturday, December 3, 2016 2:38:57 p.m., the appellant emailed Vasey and Williams a draft "Operations Plan:  Consent Searches, December 5, 2016," regarding the suspects' residences.[4]  IAF, Tab 7 at 52-55.  The next morning, at 11:49 a.m., the appellant emailed the team thanking them in advance for agreeing to participate in consent searches, and stated, "Our goal is to

---

[4] The appellant emailed Williams and Vasey and amended plan on December 4, 2016. IAF, Tab 7 at 48-51.

convince the employees to surrender personal property stolen from the bags of passengers out of a bag room at LGA and take statements if they are willing." *Id*., Tab 28 at 72.   Interestingly, despite his fixation on conducting consent searches rather than attempt to obtain search warrants, and his professed extensive planning and preparation, the appellant also noted, "I have all the forms necessary for the two teams except 'consent-to-search' [forms].   If anyone has them, please bring them." *Id*.; RF, Tab 11 (track 1).  At the hearing, the appellant proffered no explanation for why he did not have the consent-to-search forms.

On Monday morning, the appellant was the last of the seven team members to arrive at the location he designated for the pre-search briefing.  He blamed a three-hour drive in bumper to bumper traffic for his late arrival.[5]  RF, Tab 11 (track 1).  By the time he arrived, Vasey and Williams had decided that TSA would not attempt to conduct the consent searches.

Vasey recalled that he spoke with Williams before the other agents arrived. They believed the case was not at the stage to ask the suspects to consent to searches, but was at the stage to request search warrants.  RF, Tab 12 (track 1). Williams testified that he did not believe the suspects would have consented, so the team needed to be ready to go to the prosecutor to obtain warrants.  *Id*., Tab 11 (track 6).   However, Vasey advised Williams that the appellant had not completed case work they expected would be done, specifically he had not reviewed all of the camera footage from Room 11 to ascertain when the thefts had occurred and what was taken, like the JetBlue security officer previously had done.  Therefore, there would be nothing to show the prosecutor if the suspects did not consent to their residences being searched.  *Id*.  Such information would have supported TSA's request for search warrants.  Consequently, Vasey and

---

[5] Several times during the hearing the appellant blamed traffic for his inability to complete tasks in a timely manner.

Williams decided not to follow through with the appellant's proposed operations plan. *Id*.

Williams testified that TSA's goal was to a get search warrant or arrest warrant. He believed that based on the volume of thefts, there was sufficient justification for obtaining a warrant, noting that probable cause meant something was more likely to be true than not. RF, Tab 11 (track 6). However, information derived from a review of the Room 11 camera footage would have reinforced the request for a warrant. Accordingly, the appellant was instructed to review all footage and compile a list of stolen items. *Id*.

Initially, the appellant denied that Williams or Vasey ever asked him to review the footage and compile a list of stolen items before December 5, 2016. However, when confronted with his deposition testimony, he admitted that they had.[6] He attempted to justify his discrepant testimony by claiming Williams and Vasey only discussed the idea "in earnest in 2017." RF, Tab 11 (track 3). Not only was the appellant's testimony inconsistent, but it was contradicted by his own emails. In his November 21, 2016 email to Williams and Vasey, the appellant stated, "We will aim to download video from the camera early next week to identify additional thefts based on video and theft complaints." IAF, Tab 28 at 57. Yet, two weeks later, the appellant still had not reviewed camera footage. Similarly, in a November 30, 2016 email that he copied to Vasey, the appellant stated, "I'll try to get more descriptions of property from incidents going back to the first of the year." *Id*. at 60. Based on the foregoing, I find that the appellant was asked to review all Room 11 footage and summarize the thefts prior to December 5, 2016. *Hillen*, 35 M.S.P.R. at 458.

The appellant also argued that a review of all Room 11 recordings would have provided probable cause justifying a search warrant because he had no

---

[6] On several occasions during his testimony, the appellant was impeached with testimony from his August 20, 2019 deposition. *See* IAF, Tab 27 at 25.

information regarding where the stolen items had been taken. Yet, he asserted that he could have used the few "snippets" of video he had been able to view on his cell phone to convince the suspects to consent to the searches. Nonetheless, he admitted that he only speculated that there was a 50 percent chance they would have consented. RF, Tab 11 (track 1).

The appellant also averred that he spoke to a Brooklyn AUSA and the Queens County DA's office regarding his operations plan. However, he admitted that he told them that TSA's investigation did not rise to the level of search warrants. RF, Tab 11 (track 1). The appellant is not a lawyer, but reached this legal conclusion, rather than allowing the AUSA or ADA to do so.

Williams later spoke to the Brooklyn AUSA. The AUSA confirmed that she had spoken with appellant. However, she advised him to talk to the Queens DA because the nature of the theft was below the AUSA's threshold for prosecution. The AUSA also confirmed that the appellant did not request search warrants. RF, Tab 11 (track 6).

The appellant finally began reviewing all Room 11 camera footage on December 7, 2016. He estimated, "It may take me several days to get through it all in order to identify incidents of observable thefts" and document the thefts by date and time. IAF, Tab 28 at 73-74. In actuality, it took him until January 10, 2017 to complete this task. *Id*. at 75-77. The appellant testified it was time-consuming, meticulous work for which he did not have time, but did not articulate what else he was working on during this time period that stretched his estimated "several days" into more than one month. He further asserted that he was not given any help to complete the review (RF, Tab 11, track 2), but conceded on cross-examination that on December 7, 2016, Williams offered him help, which he declined. *Id*. (track 3); IAF, Tab 28 at 73. He also admitted that had the suspects agreed to the consent searched, it would have saved him a significant amount of time and effort. RF, Tab 11 (track 3).

In his OSC complaint, the appellant claimed, "Ultimately, because Mr. Williams and Mr. Vasey botched the investigation, no arrests were made and no stolen items recovered." IAF, Tab 2 at 23. At the hearing, he testified that after his discussion with Williams and Vasey on December 5, 2016, he knew "the chance for an arrest and conviction were lost forever." . RF, Tab 11 (track 3). However, he already had admitted on cross-examination that the two TSOs ultimately were prosecuted. *Id*. Williams, Darci Bobo, the appellant's third-line supervisor, and John Busch, then the Director of the Investigations Division and the appellant's fourth-line supervisor, corroborated this testimony. *Id*. (track 6); Tab 12 (tracks 3, 4). The appellant reluctantly agreed that the agency mission had been accomplished with these prosecutions, but complained, "I got no credit." All my hard work was forgotten." *Id*., Tab 11 (track 3).

The appellant contended he first disclosed what he deemed to be Williams's and Vasey's mishandling of the theft investigation on December 5, 2016 "during the investigation." IAF, Tab 2 at 22. At the hearing, he elaborated that after arriving at the meeting point, Williams and Vasey summoned him into an office and asked, "Where's your head at." RF, Tab 11 (track 1). A discussion then ensued whether the investigation had progressed to the point that merited search warrants. Williams believed it had, but the appellant maintained it had not. *Id*. Williams and the appellant also debated the propriety of using a *Garrity* warning versus a *Kalkines* warning.[7] *Id*. (tracks 1, 6).

When asked on cross-examination whether the discussion was about different investigative strategies, the appellant quibbled and replied, "Well, legal

---

[7] A *Garrity* warning advises a federal employee that any statement he gives under the threat of discipline or discharge cannot be used against him in a subsequent criminal proceeding. *Garrity v. New Jersey*, 385 U.S. 493 (1967). Under *Kalkines*, an employee cannot be disciplined for remaining silent unless he is informed that his responses and their fruits cannot be used against him in a criminal matter. *Kalkines v. U.S.*, 473 F.2d 1391 (Ct. Cl. 1973).

concepts; let's call it that." RF, Tab 11 (track 3). When asked, "Didn't you use the word strategy at your deposition," the appellant responded, "Maybe." Then when asked, "Did you misspeak at your deposition," he replied, "Possibly." As demonstrated during this exchange, the appellant's demeanor on cross-examination often was confrontational and smug.

While disclosures made to the alleged wrongdoer are covered under the WPEA (*see Day v. Department of Homeland Security*, 119 M.S.P.R. 589 (2013)), I find that the appellant's December 5, 2016 discussion about investigative strategy with Williams and Vasey did not amount to a protected disclosure. Even under the expanded protections afforded by the WPEA, general philosophical or policy disagreements with agency decisions or actions are not protected unless they separately comprise a protected disclosure of one of the types of wrongdoing set forth in 5 U.S.C. § 2302(b)(8)(A). *Webb v. Department of the Interior*, 122 M.S.P.R. 248, ¶ 8 (2015). Discussion among employees and supervisors regarding different possible courses of action is healthy and normal in any organization. *Reid v. Merit Systems Protection Board*, 508 F.3d 674, 678 (2007).

Next, the appellant contended that during his April 12, 2017 mid-year review with Williams and Vasey, he again discussed the LGA Baggage Room theft investigation. IAF, Tab 23 at 12, ¶¶ 12-13; RF, Tab 11 (track 2). Although he cited to no document to support his assertion, the appellant testified that when the subject of the LGA theft investigation arose, the mid-year review meeting "got heated." He expounded he knew that Williams and Vasey "didn't know what they were doing" and that their investigative backgrounds were "very scant." *Id*. (track 3). When confronted with his deposition testimony, however, the appellant admitted that he did not know about either of their investigative backgrounds. *Id*. Despite such admission, during his testimony, the appellant frequently maligned the investigatory skills of Vasey and Williams, claiming they lacked the knowledge and experience to conduct criminal investigations.

The appellant asserted that he again raised the issue regarding Williams's and Vasey's purported mishandling of the theft investigation for a third time during his quarterly review conducted on the July 25, 2017. As they had for his mid-year review, Williams and Vasey traveled to the appellant's Boston office for the quarterly review. RF, Tab 11 (track 2). In addition to receiving his review, the appellant was issued an improvement period notice (IPN), which gave him 60 days to demonstrate acceptable performance. *Id*.; Tab 7 at 38-41. During his testimony, the appellant offered little evidence concerning what was discussed about regarding the LGA baggage theft investigation. Instead, the focus of his testimony was his belief that the IPN "was absolutely not justified," was "manufactured" by Williams and Vasey, and that the "goals were absolutely not attainable" because by Williams and Vasey rejected everything he submitted. RF, Tab 11 (track 2).

A memorandum to file prepared by Williams shortly after the July 25, 2017 review reflects that the LGA baggage theft case was discussed. IAF, Tab 7 at 34-37; RF, Tab 11 (track 6). Williams memorialized that the appellant accused both Williams and Vasey of causing him to "lose" the LGA Baggage Room 11 thefts case on December 5, 2016 when because they did not agree with his plan to conduct consent searches before the appellant had completed a thorough review of the Room 11 surveillance video. Williams further related that the appellant questioned Williams and Vasey about their investigative experiences and experience with conducting searches and obtaining search warrants. Williams noted that he and Vasey had extensive experience in writing, obtaining and executing federal and state search and arrest warrants, with a combined number in the hundreds. *Id*. at 35. Thus, this memorandum confirms that the appellant did raise his issues with the handling of the baggage theft investigation during his July 25, 2017 quarterly review.

Consistent with what Williams memorialized, it was evident from the substance of his testimony, and the manner in which he testified, that the

appellant believed he possessed superior investigatory skills compared to Williams and Vasey. The appellant has a Master's in Criminal Justice. He attended Basic Criminal Investigator School at the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia. He also received training at the Secret Service School in Beltsville, Maryland, before serving as a Secret Service agent for 20 years, including 16 years as a supervisor. RF, Tab 11 (track 1).

Vasey, too, worked as a Secret Service agent. He served for over 22 years, from April 1976 to September 1998. The then worked as a law enforcement officer for the Department of Justice, Office of Inspector General from September 1998 to October 2010, when he entered on duty with the TSA's Office of Inspection, where he remained until his retirement. RF, Tab 12 (track 1); IAF, Tb 32 at 54-56 (Q9, A9). Williams has a Bachelor of Science degree in Criminal Justice. He possessed 15 years of federal law enforcement experience before entering on duty with TSA as the SAC for the Northeast Region in May 2015. RF, Tab 11 (track6). Williams also attended Basic Criminal Investigator School at FLETC. As such, the appellant's estimation of his own skills notwithstanding, he adduced no evidence that Williams and Vasey were not qualified for their positions or otherwise incompetent.

The appellant claimed his fourth disclosure was contained in a September 11, 2017 email he sent to Bobo. IAF, Tab 2 at 23; Tab 7 at 28-33. The email opened with, "Please accept this notification as an official complaint of mismanagement and retaliation lodged against SAIC Tom Williams and DSAIC Jeff Vasey by me, and take whatever action you deem appropriate." *Id*. at 28. The appellant asserted, "The mismanagement was amplified on December 5, 2016. On that date, a dispute between them and me [sic] arose over investigative

strategy[8] in the midst of an on-going investigation," referring to the LGA baggage theft case. *Id*. He elaborated,

> The mismanagement was amplified on December 5, 2016. On that date, a dispute between them and me arose over investigative strategy in the midst of an on-going investigation. During the midyear review not long after, they refused to take ownership of actions they took in a theft investigation that crippled my case. Their decisions and actions denied me the satisfaction of two arrests and two convictions by the close of 2016. My sin was holding them to account for their decisions and actions.

*Id*. at 28. He claimed that as a result of this discussion, Vasey and Williams buried him with work. *Id*.

The appellant explained to Bobo that as part of his investigation, he had a surveillance camera installed in the baggage room for approximately 30 days and it recorded a total of 23 thefts attributable to two employees. He expressed his belief that, "Once management placed the employees on suspension, opportunities to observe them in REAL TIME pilfering checked baggage was lost." IAF, Tab 7 at 29. He contended,

> Nevertheless, there was plenty of 'reasonable suspicion' that stolen property could be recovered from each residence. However, Williams and Vasey mistakenly and foolishly believed that the mere 'suspicion' rose to the level meriting federal search warrants.

*Id*. The appellant contended, "I knew better based upon experience and knowledge of case law – federal search warrants require "probable cause." He related that after speaking with the AUSA duty assistant, who referred him to the Queens District Attorney's Office (QDAO), "I prepared for the next best thing – 'consent searches.'" *Id*. He then prepared the operations plan for the consent searches. *Id*.

---

[8] This document confirms that the appellant believed his disagreement with Williams and Vasey concerned investigative strategy.

As related in his email, it seemed as if the appellant had spoken to the DA's office prior to arriving at his decision to conduct consent searches. However, as noted in his Saturday, December 3, 2016 email to Williams, the ADA had not yet returned his call so he intended to "connect" with her on Monday morning, the morning when the searches were to be conducted. IAF, Tab 28 at 69. Moreover, the appellant did not explain to Bobo that he told the ADA there was no probable cause (RF, Tab 11, track 3), rather than allow her, the legal expert, to make a determination. The appellant also failed to mention that Williams had considered conducting consent searches, as evidenced by his December 3, 2016 email to the appellant in which he mentioned a contingency plan in case "no one gets in to see the Wizard." *Id.* Once Williams learned that the appellant had only reviewed limited portions of the Room 11 camera footage, however, he concluded that the suspects likely would not consent. RF, Tab 11 (track 6).

In his email, the appellant also set forth three items about which, in his opinion, Williams and Vasey were mistaken: that the case merited federal search warrants; the meaning of a *Garrity* warning; and how to secure an arrest warrant. The appellant wrote, "They thought they knew better, but they didn't. They didn't think I knew better, but I did." IAF, Tab 7 at 30. He then complained about having to spend the last three weeks of December 2016 "meticulously viewing and documenting 30 days of video footage, often in slow motion, day-by-day, hour-by-hour, minute-by-minute, and second-by-second." *Id.*

The appellant also recounted that at his July 25, 2017 quarterly review, "I reminded them [Williams and Vasey] of what is written above," referencing the earlier portion of his email criticizing his supervisors and the investigative strategy they pursued in connection with the baggage theft case. IAF, Tab 7 at 32.

Bobo responded to the appellant's email on September 14, 2017. IAF, Tab 7 at 23. Bobo testified that she considered the appellant's email to be a

performance issue, not a protected disclosure. RF, Tab 12 (track 3). In fact, a significant portion of the appellant's five-page, single-spaced email dealt with his workload and Williams's and Vasey's assessment of his performance. IAF, Tab 7 at 28-33. Bobo also testified that after receiving the appellant's email, she instructed Williams to have a discussion with the appellant regarding the proper way to handle searches and take direction. Additionally, she told Williams to instruct the appellant to follow supervisory directions even if he disagreed. Bobo's instruction was consistent with *Jinks v. Department of Veterans Affairs*, 106 M.S.P.R. 627, ¶ 11 (2006), which holds that an employee should conform to a lawful instruction and challenge it later if he thought the instruction was wrong. While this is essentially what the appellant did, at the hearing he admitted that neither Vasey nor Williams ever instructed him to violated the law. RF, Tab 11 (track 3).

In addition to the appellant's email substantiating that his disagreement with Williams and Vasey was about investigative strategy, it also demonstrates his utter lack of respect for Williams and Vasey. The appellant's disdain was evident from his demeanor, tone and choice of words, repeatedly referring to Williams and Vasey as foolish and ignorant, as well as lacking in knowledge and experience. On several occasions, rather than answer the question posed, the appellant attempted to interject negative information about Vasey. In fact, throughout his testimony, the appellant tended to over-explain his actions and digress by offering extraneous information unrelated to the alleged disclosures and adverse personnel actions. Even when asked straightforward questions, his responses were rambling. On cross-examination, he became even more evasive and bombastic in his answers. All of these factors detracted significantly from his credibility. *Hillen*, 35 M.SP.R. at 462.

Lastly, the appellant contended that his November 21, 2017[9] response to an October 26, 2017 notice of proposed removal[10] constituted his fifth disclosure about Williams's and Vasey's supposed mishandling of the baggage theft investigation.  IAF, Tab 2 at 23; Tab 6 at 41-50; 54-59.  In his response, the appellant admitted that he questioned Williams and Vasey "about their knowledge of criminal law, procedures, and the use of a *Garrity* warning (non-custodial rights)."  *Id*. at 44.  The appellant reiterated his belief that, "Mr. Williams and Mr. Vasey had little understanding of the probable cause required to obtain search warrants, the use of warnings, and the indictment process."  *Id*.  He asserted that by repeatedly questioning and opposing Williams's and Vasey's "erroneous insistence that search warrants were needed," he engaged in activity protected under the WPA.  *Id*.

In his OSC complaint, the appellant again disparaged Williams' and Vasey's investigative knowledge and acumen.  During the investigation, he told Williams and Vasey that "their failure to recognize basic criminal procedure would jeopardize the investigation."  IAF, Tab 2 at 23.  He then claimed that "because Mr. Williams and Mr. Vasey botched the investigation, no arrests were made and no stolen items recovered."  *Id*.  But, the TSOs were arrested and prosecuted.  As such, his assertion that the "failure to secure these arrests further supports [his] reasonable belief that proper and correct investigative decisions were not adequately taken into consideration in line with TSA rules, regulations, and procedures" is unfounded.  *Id*. at 24.  Not only is his assertion of no arrest inaccurate, the appellant did not cite to any specific "proper and correct investigative decision," rule, regulation or procedure that was not followed.  The

---

[9] In his OSC complaint, the appellant asserted that his response was dated November 16, 2017.  IAF, Tab 2 at 23.

[10] The proposal notice was issued based on the results of the appellant's performance during his 60-day IPN period.  IAF, Tab 6 at 54-59.

appellant's purely subjective belief that he "knew better" than Williams and Vasey does not constitute a reasonable belief. *Giove v. Department of Transportation*, 230 F.3d 1333, 1338 (Fed. Cir. 2000). The WPA is not a weapon in arguments over policy or a shield for insubordinate conduct. *Lachance*, 174 F.3d at 1380-81.

Even acknowledging that proceeding with the consent searches was a valid investigative strategy, Williams's and Vasey's decision not to proceed in that manner did not rise to the level of gross mismanagement. Gross mismanagement means a management action or inaction which creates a substantial risk of significant adverse impact upon the agency's ability to accomplish its mission. *Johnson v. Department of Justice*, 104 M.S.P.R. 624, ¶ 16 (2007). A disclosure questioning management decisions that are merely debatable or mere negligence, with no element of blatancy, is not protected as a disclosure of gross mismanagement. *Sazinski*, 73 M.S.P.R. at 686-87 (citation omitted).

As noted above, the appellant speculated that there was only a 50 percent chance the suspects would have agreed to the consent searches. RF, Tab 11, track 1. Nonetheless, he disagreed with the decision of Williams and Vasey not to conduct consent searches. At most, his disagreement over the investigative strategy employed by Williams and Vasey constituted a general philosophical disagreement, not a protected disclosure. *Salerno v. Department of the Interior*, 123 M.S.P.R. 230, ¶ 7 (2016). Despite his disagreement over strategy, the agency's mission was accomplished with the prosecution of the two TSOs, which the appellant begrudgingly acknowledged. RF, Tab 11 (track 3). Furthermore, it was evident throughout his testimony that the appellant's actual complaint was the length of time it took him to review the camera footage and the fact that he did not get any credit for the prosecution of the TSOs.

Based on the foregoing, I find that a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the appellant would not have reasonably concluded that the actions of Williams and Vasey evidenced

wrongdoing as defined by the WPA. Consequently, none of the appellant's ostensible disclosures concerning Williams's and Vasey's handling of the LGA baggage theft investigation constitute protected whistleblowing.

## 2. Vasey's abuse of authority

The appellant's remaining three alleged disclosures (six through eight; IAF, Tab 2 at 23) related to Vasey's supposed abuse of authority.[11] The sixth purported disclosure was made on February 6, 2018 after Bobo issued a January 25, 2018 notice of a decision regarding the appellant's October 26, 2017 notice of proposed removal. After reviewing documents related to the IPN, the proposal notice, and the appellant's response, Bobo determined that although the appellant's performance deficiencies outlined in the proposed removal were significant, she believed the mitigating factors outweigh any aggravating factors. Therefore, she decided removal was not warranted and issued no disciplinary action. . IAF, Tab 6 at 38-40. *Id.* Nevertheless, Bobo testified she was concerned with the appellant's investigative judgment and performance, but believed he could improve with training. RF, Tab 12 (track 3).

Because, as Bobo noted, the appellant's performance was deficient with respect to one of his performance goals (IAF, Tab 6 at 66, 80-83, 54-59, 38-40), Williams and Vasey met with him on February 6, 2018 to discuss a remediation plan pursuant to which he was given an additional opportunity to improve his performance during the 2018 performance year. The plan included sending the appellant to three training courses and providing him with mentoring for 30 days. *Id.* at 36-38. At some point in the meeting, the appellant asked Williams and Vasey if they were audio-recording the meeting. Williams and Vasey denied

---

[11] An abuse of authority occurs when there is an arbitrary or capricious exercise of power by a federal official or employee that adversely affects the rights of any person or results personal gain or advantage to himself or to preferred other persons. *Herman v. Department of Justice*, 115 M.S.P.R. 386, ¶ 11 (2011).

recording the meeting. RF, Tab 11 (track 2). The appellant admitted that he had no proof that Vasey and Williams had secretly recorded him. *Id.* (track 4).

During the remediation plan meeting, a TSA Human Resources representative participated via telephone. RF, Tab 11 (tracks 4, 6). She explained the plan to the appellant. *Id.* (track 4). Once she hung up, the appellant accused Vasey of supposed misconduct involving his ex-wife and an ex-girlfriend. Specifically, he asked if Vasey had hit his ex-wife with open hand, closed fist, beer or whiskey bottle. When asked, "Did you make that up; Vasey does not even drink," the appellant responded, "Meh. I just asked him. He could have answered." *Id.* (track 4).

The appellant further contended that Vasey had stalked his ex-girlfriend, an AUSA. RF, Tab 11 (track 2). According to the appellant, Vasey misused his authority and credentials to get information about the woman from a hotel clerk, may have crossed state lines, and may have taken photographs that were anonymously sent to the Department of Justice's Inspector General.[12] *Id.*; Tab 32 at 16.

When asked if the allegations were from more than 20 years ago, the appellant admitted they were "stale, old allegations; yes, correct." RF, Tab 11 (track 4). The appellant further admitted that he had learned about the allegations in 2015. The appellant offered no proof in support of his allegations. He merely indicated he learned about the accusations from two different unnamed sources. *Id.* (tracks 2, 4). At his deposition, when asked what proof he had to support these accusations, he admitted, "I didn't have any evidence. I had none. I had zero." IAF, Tab 21 at 15 (page 261, lines 7-9).

---

[12] That same day, Vasey reported the appellant's "harassing behavior and inappropriate conduct" and "unequivocally denied" the allegation to the agency's Office of Inspection. IAF, Tab 32 at 64-65.

As a result of leveling these allegations against Vasey, on February 7, 2018 Williams issued the appellant a letter of counseling. IAF, Tab 6 at 33-34. The appellant signed the letter on February 14, 2018. *Id*. at 34. However, this letter of counseling had been rescinded by letter dated February 7, 2019. *Id*. at 21. As indicated in the rescission letter, a new letter of counseling was issued. *Id*. The new letter, also dated February 7, 2019, was substantively the same as the prior letter. *Id*., *cf*., at 22-23; 33-34. The letter reminded the appellant that he was responsible for exercising courtesy and tact in dealing with fellow workers and supervisors, as well as for "[s]upporting and assisting in creating a productive and hospitable model work environment." *Id*. at 33. It was not a disciplinary action and was not placed in the appellant's official personnel folder.

On February 7, 2018, the day after the remediation plan meeting, the appellant sent an email to Bobo in which he related the accusations he had directed to Vasey during the meeting. IAF, Tab 32 at 8-9. In the response she sent the next morning, Bobo indicated that the agency would review the appellant's allegations and proceed accordingly, but asked the appellant for details, including, "when these events occurred, where did they occur, any witnesses to the events and any additional info regarding these allegations, etc." *Id*. The appellant provided no details.

The agency considered the appellant's allegations against Vasey to be serious and, on February 8, 2018, assigned Special Agents Christopher Leeman and Keith Edwards, Office of Inspection, to investigate. IAF, Tab 32 at 7-16. From February 8 to April 2, 2018, Leeman and Edwards conducted formal interviews and attempted to obtain official law enforcement and personnel records regarding all three allegations raised by the appellant. These allegations included not only the claims about Vasey's ex-wife and ex-girlfriend, but also the claim that "Vasey unlawfully and inappropriately audio recorded one or more discussion(s) with Besanceney, without his knowledge or permission." *Id*. at 4, 7.

As part of their fact finding, Leeman and Edwards interviewed the appellant on February 12, 2018, the date of his alleged seventh protected disclosure. IAF, Tab 2 at 23; Tab 32 at 18-19. During his interview, the appellant admitted he did not have direct knowledge or possess direct evidence of to support his allegations regarding Vasey's ex-wife and former girlfriend. *Id*. at 19. Rather, he was relying on "sources" he refused to reveal. *Id*.

On February 6, 2018, the appellant also provided a sworn statement. IAF, Tab 32 at 20-25. When asked what he intended on February 6, 2018 by asking Vasey in front of Williams if Vasey, had hit his ex-wife with an open hand, a closed fist, a beer bottle, or a whiskey bottle, wife," he admitted, "My intention was to challenge Vasey, and Williams, to face facts, rather than only [allow them to] mischaracterize my integrity, work ethic, and work product. *Id*. at 22. In an email he sent to Leeman and Edwards on February 14, 2018, the appellant admitted that the "domestic [incident] and stalking allegations are stale and dated." *Id*. at 50. In fact, he averred they were from "circa 1997." *Id*. at 18, 21.

Leeman interviewed an assistant in the police department in the state where the appellant claimed Vasey had lived at the time of the incident involving his ex-wife. The assistant also conducted a search of the department's automated records system, which uncovered no criminal records regarding Vasey or the alleged incident. IAF, Tab 34 at 39-40. The assistant noted, however, that calls for police service were only maintained for three months. *Id*.

Similarly, Leeman contacted the DOJ OIG and requested that they check available databases to determine whether any responsive record(s) supported the stalking allegation. IAF, Tab 34 at 42. The DOJ OIG related it had no records relevant to or supporting, in whole or in part, an allegation that "Vasey misused his official position as a Federal Law Enforcement Officer with the DOJ-OIG to investigate or 'stalk' DOJ Attorney [] without official cause or predication." *Id*. at 43-46. Ultimately, the investigation was closed on April 4, 2018 after Leeman

and Edwards were unable to substantiate any of the appellant's allegations against Vasey.[13]  *Id*. at 4-5.

On March 7, 2018, the appellant filed a complaint with the agency's OIG in which he reiterated his claims about Vasey's alleged domestic abuse and stalking incidents as well as his claim that Vasey and Williams had improperly recorded him without his consent.  IAF, Tab 30 at 70-74.  Again, at the hearing, the appellant admitted he had no evidence of a "covert" recording.  RF, Tab 11 (track 4).  When asked at his deposition about his contention that Vasey and Williams had audio-recorded meetings, the appellant conceded that he had not seen or heard any recording devices.  IAF, Tab 21 at 20 (page 236, lines 1-15).  Based on his own admissions that he had no proof of being audio-recorded by Vasey or Williams, I find he did not possess the reasonable belief necessary that his disclosures revealed misconduct described in 5 U.S.C. § 2302(b)(8).

Similarly, regarding Vasey's alleged abuse of authority, the appellant admitted he had no evidence except for the limited information he obtained from unnamed sources.  He testified he did not ask his unnamed sources how they acquired their information about Vasey.  Moreover, even though his sources gave him the names of potential witnesses, the appellant did contact these individuals in an effort to obtain additional information.  RF, Tab 11 (track 4).  As such, I find the appellant did not possess a reasonable belief that Vasey had engaged in the domestic abuse and stalking incidents the appellant ostensibly disclosed.  There were no essential facts known to and readily ascertainable by the appellant regarding these accusations.  Thus, no disinterested observer could have reasonably concluded the unsubstantiated accusations again Vasey constituted protected disclosures.  Rather, these disclosures were based on mere rumors, which are the type of disclosure the WPA protects.  *See Johnson*, 104 M.S.P.R. at ¶ 15.

---

[13] The entire investigation is found at IAF, Tab 32 at 4 through Tab 34 at 46.

In his OSC complaint, the appellant asserted that OSC did not consider whether his OIG disclosure was protected under 5 U.S.C. § 2302(b)(9), contending that such a claim was easier to prove than an allegation under § 2302(b)(8) because the former did not limit protected disclosures to those that met the "reasonable belief" test as required by § 2302(b)(8).  He argued that all disclosures to the OIG were protected regardless of whether they were reasonable.  IAF, Tab 2 at 37 n.1.  Although § 2302(b)(9)(C) makes it a prohibited personnel practice for an agency to take a personnel action because an employee made a disclosure to the agency's OIG, the mere act of speaking or filing a complaint with OIG is insufficient.  The information provided to the OIG must rise to the level of whistleblowing.  *See Schlosser v. Department of the Interior*, 75 M.S.P.R. 15, 21 (1997).  The appellant's unsupported allegations about Vasey do not rise to the level of protected whistleblowing disclosures.  *See Huffman v. Office of Personnel Management*, 92 M.S.P.R. 429, ¶ 10 (2002) (reporting unsubstantiated rumors does not satisfy the reasonable belief requirement).

Findings

As detailed above, I find that none of the disclosures the appellant raised before OSC are protected under the WPA because none actually disclosed any alleged wrongdoing by TSA or its employees.  Fundamental to the nature of a protected disclosure is that it "blows the whistle" by reporting the commission of one of the types of wrongdoing enumerated in 5 U.S.C. § 2302(b)(8)(A).  Here, the appellant's alleged disclosures constituted mere disagreements with Williams's and Vasey's choice of investigative strategy, and the recounting of unsubstantiated accusations against Vasey, without an accompanying showing that such matters constituted a report of wrongdoing of the type specified by the statute.  The appellant's complaints did not disclose a violation of a law, rule, or regulation; gross mismanagement; a gross waste of funds; an abuse of authority;

or a substantial and specific danger to public health or safety.  Consequently, his request for corrective action is denied.

## DECISION

The appellant's request for corrective action is DENIED.

FOR THE BOARD:                    _____/s/_____
                                 Kara Svendsen
                                 Administrative Judge

## NOTICE TO APPELLANT

This initial decision will become final on **November 1, 2021**, unless a petition for review is filed by that date.  This is an important date because it is usually the last day on which you can file a petition for review with the Board.  However, if you prove that you received this initial decision more than 5 days after the date of issuance, you may file a petition for review within 30 days after the date you actually receive the initial decision.  If you are represented, the 30-day period begins to run upon either your receipt of the initial decision or its receipt by your representative, whichever comes first.  You must establish the date on which you or your representative received it. The date on which the initial decision becomes final also controls when you can file a petition for review with one of the authorities discussed in the "Notice of Appeal Rights" section, below. The paragraphs that follow tell you how and when to file with the Board or one of those authorities. These instructions are important because if you wish to file a petition, you must file it within the proper time period.

## BOARD REVIEW

You may request Board review of this initial decision by filing a petition for review.

If the other party has already filed a timely petition for review, you may file a cross petition for review.  Your petition or cross petition for review must

state your objections to the initial decision, supported by references to applicable laws, regulations, and the record.  You must file it with:

The Clerk of the Board
Merit Systems Protection Board
1615 M Street, NW.
Washington, DC 20419

A petition or cross petition for review may be filed by mail, facsimile (fax), personal or commercial delivery, or electronic filing.  A petition submitted by electronic filing must comply with the requirements of 5 C.F.R. § 1201.14, and may only be accomplished at the Board's e-Appeal website (https://e-appeal.mspb.gov).

## NOTICE OF LACK OF QUORUM

The Merit Systems Protection Board ordinarily is composed of three members, 5 U.S.C. § 1201, but currently there are no members in place.  Because a majority vote of the Board is required to decide a case, *see* 5 C.F.R. § 1200.3(a), (e), the Board is unable to issue decisions on petitions for review filed with it at this time.  *See* 5 U.S.C. § 1203.  Thus, while parties may continue to file petitions for review during this period, no decisions will be issued until at least two members are appointed by the President and confirmed by the Senate.  The lack of a quorum does not serve to extend the time limit for filing a petition or cross petition.  Any party who files such a petition must comply with the time limits specified herein.

For alternative review options, please consult the section below titled "Notice of Appeal Rights," which sets forth other review options.

## Criteria for Granting a Petition or Cross Petition for Review

Pursuant to 5 C.F.R. § 1201.115, the Board normally will consider only issues raised in a timely filed petition or cross petition for review. Situations in which the Board may grant a petition or cross petition for review include, but are not limited to, a showing that:

(a) The initial decision contains erroneous findings of material fact.  (1) Any alleged factual error must be material, meaning of sufficient weight to warrant an outcome different from that of the initial decision.  (2) A petitioner who alleges that the judge made erroneous findings of material fact must explain why the challenged factual determination is incorrect and identify specific evidence in the record that demonstrates the error.  In reviewing a claim of an erroneous finding of fact, the Board will give deference to an administrative judge's credibility determinations when they are based, explicitly or implicitly, on the observation of the demeanor of witnesses testifying at a hearing.

(b) The initial decision is based on an erroneous interpretation of statute or regulation or the erroneous application of the law to the facts of the case.  The petitioner must explain how the error affected the outcome of the case.

(c) The judge's rulings during either the course of the appeal or the initial decision were not consistent with required procedures or involved an abuse of discretion, and the resulting error affected the outcome of the case.

(d) New and material evidence or legal argument is available that, despite the petitioner's due diligence, was not available when the record closed.  To constitute new evidence, the information contained in the documents, not just the documents themselves, must have been unavailable despite due diligence when the record closed.

As stated in 5 C.F.R. § 1201.114(h), a petition for review, a cross petition for review, or a response to a petition for review, whether computer generated, typed, or handwritten, is limited to 30 pages or 7500 words, whichever is less.  A reply to a response to a petition for review is limited to 15 pages or 3750 words, whichever is less.  Computer generated and typed pleadings must use no less than 12 point typeface and 1-inch margins and must be double spaced and only use one side of a page.  The length limitation is exclusive of any table of contents, table of authorities, attachments, and certificate of service.  A request for leave to file a pleading that exceeds the limitations prescribed in this paragraph must be

received by the Clerk of the Board at least 3 days before the filing deadline. Such requests must give the reasons for a waiver as well as the desired length of the pleading and are granted only in exceptional circumstances. The page and word limits set forth above are maximum limits. Parties are not expected or required to submit pleadings of the maximum length. Typically, a well-written petition for review is between 5 and 10 pages long.

If you file a petition or cross petition for review, the Board will obtain the record in your case from the administrative judge and you should not submit anything to the Board that is already part of the record. A petition for review must be filed with the Clerk of the Board no later than the date this initial decision becomes final, or if this initial decision is received by you or your representative more than 5 days after the date of issuance, 30 days after the date you or your representative actually received the initial decision, whichever was first. If you claim that you and your representative both received this decision more than 5 days after its issuance, you have the burden to prove to the Board the earlier date of receipt. You must also show that any delay in receiving the initial decision was not due to the deliberate evasion of receipt. You may meet your burden by filing evidence and argument, sworn or under penalty of perjury (*see* 5 C.F.R. Part 1201, Appendix 4) to support your claim. The date of filing by mail is determined by the postmark date. The date of filing by fax or by electronic filing is the date of submission. The date of filing by personal delivery is the date on which the Board receives the document. The date of filing by commercial delivery is the date the document was delivered to the commercial delivery service. Your petition may be rejected and returned to you if you fail to provide a statement of how you served your petition on the other party. *See* 5 C.F.R. § 1201.4(j). If the petition is filed electronically, the online process itself will serve the petition on other e-filers. *See* 5 C.F.R. § 1201.14(j)(1).

A cross petition for review must be filed within 25 days after the date of service of the petition for review.

## NOTICE TO AGENCY/INTERVENOR

The agency or intervenor may file a petition for review of this initial decision in accordance with the Board's regulations.

## NOTICE OF APPEAL RIGHTS

You may obtain review of this initial decision only after it becomes final, as explained in the "Notice to Appellant" section above.  5 U.S.C. § 7703(a)(1). By statute, the nature of your claims determines the time limit for seeking such review and the appropriate forum with which to file.  5 U.S.C. § 7703(b). Although we offer the following summary of available appeal rights, the Merit Systems Protection Board does not provide legal advice on which option is most appropriate for your situation and the rights described below do not represent a statement of how courts will rule regarding which cases fall within their jurisdiction.  If you wish to seek review of this decision when it becomes final, you should immediately review the law applicable to your claims and carefully follow all filing time limits and requirements.  Failure to file within the applicable time limit may result in the dismissal of your case by your chosen forum.

Please read carefully each of the three main possible choices of review below to decide which one applies to your particular case.  If you have questions about whether a particular forum is the appropriate one to review your case, you should contact that forum for more information.

**(1) Judicial review in general**.  As a general rule, an appellant seeking judicial review of a final Board order must file a petition for review with the U.S. Court of Appeals for the Federal Circuit, which must be received by the court within **60 calendar days** of the date this decision becomes final.  5 U.S.C. § 7703(b)(1)(A).

If you submit a petition for review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C.  20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov.  Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit.  The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

**(2)** **Judicial or EEOC review of cases involving a claim of discrimination**.  This option applies to you <u>only</u> if you have claimed that you were affected by an action that is appealable to the Board and that such action was based, in whole or in part, on unlawful discrimination.  If so, you may obtain judicial review of this decision—<u>including a disposition of your discrimination claims</u>—by filing a civil action with an appropriate U.S. district court (*not* the U.S. Court of Appeals for the Federal Circuit), within **30 calendar days** <u>after this decision becomes final</u> under the rules set out in the Notice to Appellant section, above.  5 U.S.C. § 7703(b)(2); *see Perry v. Merit Systems Protection Board*, 582 U.S. ____ , 137 S. Ct. 1975 (2017). If the action involves a claim of discrimination based on race, color, religion, sex, national origin, or a disabling condition, you may be entitled to representation by a court-appointed lawyer and

to waiver of any requirement of prepayment of fees, costs, or other security. *See* 42 U.S.C. § 2000e-5(f) and 29 U.S.C. § 794a.

Contact information for U.S. district courts can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

Alternatively, you may request review by the Equal Employment Opportunity Commission (EEOC) of your discrimination claims only, excluding all other issues. 5 U.S.C. § 7702(b)(1). You must file any such request with the EEOC's Office of Federal Operations within **30 calendar days** after this decision becomes final as explained above. 5 U.S.C. § 7702(b)(1).

If you submit a request for review to the EEOC by regular U.S. mail, the address of the EEOC is:

Office of Federal Operations
Equal Employment Opportunity Commission
P.O. Box 77960
Washington, D.C.  20013

If you submit a request for review to the EEOC via commercial delivery or by a method requiring a signature, it must be addressed to:

Office of Federal Operations
Equal Employment Opportunity Commission
131 M Street, N.E.
Suite 5SW12G
Washington, D.C.  20507

**(3) Judicial review pursuant to the Whistleblower Protection Enhancement Act of 2012**. This option applies to you only if you have raised claims of reprisal for whistleblowing disclosures under 5 U.S.C. § 2302(b)(8) or other protected activities listed in 5 U.S.C. § 2302(b)(9)(A)(i), (B), (C), or (D). If so, and your judicial petition for review "raises no challenge to the Board's disposition of allegations of a prohibited personnel practice described in section 2302(b) other than practices described in section 2302(b)(8) or 2302(b)(9)(A)(i), (B), (C), or (D)," then you may file a petition for judicial review with the U.S.

Court of Appeals for the Federal Circuit or any court of appeals of competent jurisdiction.  The court of appeals must <u>receive</u> your petition for review within **60 days** of <u>the date this decision becomes final</u> under the rules set out in the Notice to Appellant section, above.  5 U.S.C. § 7703(b)(1)(B).

If you submit a petition for judicial review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C.  20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov.  Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit.  The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

Contact information for the courts of appeals can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx

# CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 13th day of May, 2022, I caused this Brief of

Petitioner to be filed electronically with the Clerk of the Court using the CM/ECF

System, which will send notice of such filing to the following registered CM/ECF

users:

Ann Motto
UNITED STATES DEPARTMENT OF JUSTICE
COMMERCIAL LITIGATION BRANCH,
  CIVIL DIVISION
Ben Franklin Station
Post Office Box 480
Washington, DC  20044
(202) 353-7968

*Counsel for Respondent*

/s/ John T. Harrington
*Counsel for Petitioner*

# CERTIFICATE OF COMPLIANCE

1.      This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[ X ] this brief contains [*10,645*] words.

[     ] this brief uses a monospaced type and contains [*state the number of*] lines of text.

2.      This brief complies with the typeface and type style requirements because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 365*] in [*14pt Times New Roman*]; *or*

[     ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: May 13, 2022                              /s/ John T. Harrington
                                                 *Counsel for Petitioner*